Filed 12/1/22  P. v. Cowell CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>JOHN LEE COWELL,<br><br>      Defendant and Appellant. | A160637<br><br>(Alameda County Super. Ct. No. 18-CR-01-6431)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 15, 2022, be modified as follows:

1. On page 48:  The first full sentence which reads, "And the fact the jury found defendant guilty of attempted murder *and* found true the allegation that he committed the attempted murder willfully and with premeditation and deliberation, demonstrates that any error in not including 'intent to kill' and not referencing the special circumstance of lying in wait in the CALCRIM No. 3428 instruction was harmless, as it is not reasonably probable a more favorable

1

result would have been reached had the asserted error not occurred. (See *People v. Ocegueda, supra*, 247 Cal.App.4th at p. 1407 [whether error in limiting jury's consideration of mental disability evidence was prejudicial is determined under *Watson* standard].)" shall be modified to read:

And the fact the jury found defendant guilty of attempted murder *and* found true the allegation that he committed the attempted murder willfully and with premeditation and deliberation, demonstrates that any error in not including 'intent to kill' and not referencing the special circumstance of lying in wait in the CALCRIM No. 3428 instruction was harmless under either the federal or state standard of prejudicial error. (See *Townsel, supra,* 63 Cal.4th at p. 64.)"

2. Footnote 17 should be deleted, and all subsequent footnotes renumbered accordingly.

There is no change in the judgment.

The petition for rehearing is denied.

Dated: _____

Humes, P. J.

Filed 11/15/22  P. v. Cowell CA1/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>JOHN LEE COWELL,<br><br>          Defendant and Appellant. | A160637<br><br>(Alameda County<br>Super. Ct. No. 18-CR-01-6431) |

Defendant John Lee Cowell was charged with first degree murder and attempted murder.  Several enhancements were also alleged.  He pled not guilty by reason of insanity.  Following the guilt phase of his trial, a jury convicted him of all charges.  Later, during the sanity phase, the trial court directed a verdict that defendant was sane at the time he committed the offenses.

On appeal, defendant claims numerous errors occurred during both phases, although he does not challenge the sufficiency of the evidence supporting his convictions.  He contends the trial court erred by (1) failing to reinstate competency proceedings; (2) conditioning his presence at trial on his willingness to be cross-examined; (3) refusing to permit the jury to consider evidence of mental disease in connection with the lying-in-wait special circumstance; (4) striking his testimony for the sanity phase; (5) excluding

1

defense expert witness testimony during the sanity phase; (6) directing a verdict on sanity after the jury began deliberations; and (7) denying motions for mistrial. He additionally maintains the prosecutor committed misconduct throughout the trial.

We affirm.

<h2 style="text-align:center">BACKGROUND[1]</h2>

On a July 2018 night, three sisters, N.W., L.W., and T.W.[2] were waiting for a BART train at the Concord station. Defendant was also on the platform. All four boarded a train headed toward Oakland. T.W. and L.W. sat together, and N.W. stood nearby. Defendant, who was wearing a gray hoodie and sunglasses, sat near the sisters, but there was no interaction between them. At the MacArthur station, the sisters exited the train in order to transfer, and defendant followed.

When the next train arrived, T.W. boarded and took a seat. But before N.W. and L.W. could board, defendant stabbed both in the neck with a kitchen knife, which he had secreted in his pants pocket.

BART Police Officer Andres Rocha was on duty at the MacArthur station when he heard "people screaming and . . . running" towards him. They pointed Rocha toward the platform and told him "someone had a knife." Defendant had, by then, mixed in with the crowd and joined in "directing [the police] back towards the BART station." Rocha found N.W. and L.W. "seated on the ground, both bleeding." He began chest compressions on N.W., who

---

[1] Because what happened on the night of the crimes was largely uncontested, we provide only a brief overview of the facts here. We discuss other aspects of the trial in more detail in connection with our discussion of the issues on appeal.

[2] We use the victims' initials to protect their privacy interests. (Cal. Rules of Court, rule 8.90(b).)

had "blood pouring" from her neck and mouth, until an EMT arrived and took over. N.W. died at the scene from her injuries—a two-inch deep stab to her carotid artery. L.W. was transported to a hospital and released the following day.

About an hour after Officer Rocha was directed to the platform, defendant boarded a bus, telling the driver he had injured his leg. Defendant asked the driver to take him to the next nearest BART station, and the driver let him off near the 12th Street station.

The following day, using video footage that captured defendant's path after exiting the MacArthur station, BART police officers followed defendant's probable trail toward a parking structure. There, they recovered a pair of tan pants that matched the ones defendant was wearing in the footage. The pants had "three tears" in the front pocket. At a nearby construction site, officers found a kitchen knife.[3] Officers also found a backpack containing defendant's medical documents, prescription bottles, and a hoodie matching the one defendant was wearing in the surveillance footage.

BART officers later arrested defendant on a train at the Pleasant Hill station. He was coherent, responsive, and did not exhibit any signs that caused "concern about his mental health well-being."

The Alameda County district attorney filed an indictment charging defendant with one count of murder (Pen. Code, § 187, subd. (a)—count 1)[4] with alleged special circumstances of lying in wait (§ 190.2, subd. (a)(15)) and

---

[3] Defendant "could not be excluded as the possible major contributor" to a DNA mixture found on the knife.

[4] All further statutory references are to the Penal Code unless otherwise indicated.

personally using a deadly weapon (§ 12022, subd. (b)(1)), and one count of attempted murder (§§ 187, subd. (a), 664, subd. (a)—count 2) with allegations that defendant had acted with deliberation and premeditation, had personally used a deadly weapon and had personally inflicted great bodily injury (§ 12022.7, subd. (a)). It was further alleged defendant had suffered two prior felony convictions within the meaning of the Three Strikes law. (§§ 667, subd. (e)(2), 1170.12, subd. (c)(2).)

Defendant entered a plea of not guilty by reason of insanity. In support of his plea, defendant presented extensive evidence of his mental health history, in the form of testimony from treating physicians, defendant's own testimony, testimony from family members, and testimony from expert witnesses.

*Treating Providers*

Dr. Jesus Perez, a psychiatrist, treated defendant at Atascadero Hospital.[5] During an interview, defendant told Dr. Perez that "he used marijuana and methamphetamines on a daily basis, multiple times per day," that he "also had an issue of using heroin on and off," and that he "was drinking up to a fifth of vodka a day leading up to his arrest." While defendant "was endorsing that he was hearing voices during the interview," he was "very vague with his report of the voices." Dr. Perez did not "see any evidence that he was actually experiencing outward hallucinations at the time." Dr. Perez diagnosed defendant with "schizoaffective disorder, bipolar type, antisocial personality disorder; amphetamine type use disorder; alcohol-use disorder; cannabis-use disorder, [and] opioid-use disorder."

---

[5] Defendant was admitted to Atascadero in early 2018 and discharged four months later.

A month before the stabbings, at Contra Costa County Hospital, Dr. Jonathan Patberg treated defendant two times, a week apart. On the first occasion, defendant appeared high. He stated he used heroin "every couple of days" and wanted to get Suvoxone, a medication to "treat[] opioid addiction." Dr. Patberg did not prescribe Suvoxone at that time. A week later, on the second occasion, defendant once again sought "treatment for his opioid use history." This time, he also complained about the "presence of breast implants," which he wanted evaluated and taken out. Defendant also told Dr. Patberg he was "hearing voices" but maintained he was still taking Zyprexa, "an anti-psychotic" medication and Buspar, an "[a]nti-depressant; anti-anxiety" medication. This time, Dr. Patberg prescribed the requested Suvoxone.

A little over a week before the stabbings, Dr. Teresita Pontejos-Murphy, a staff psychiatrist at John George Psychiatric Pavilion, an in-patient psychiatric hospital, testified she treated defendant after he was placed at the hospital on a Welfare and Institutions Code section 5150 hold. Defendant reported he "had been hearing voices telling him that people were out to kill him." Dr. Pontejos-Murphy believed "those problems . . . were to be associated with medication noncompliance." Upon initial evaluation, Dr. Pontejos-Murphy noted defendant was a " 'pleasant; somewhat manipulative male; limited eye contact; no gross . . . motor agitation,' " and he was "[a]lerted to person, place, and time." On the date defendant was discharged, he "denied any suicidal ideation or homicidal ideation," "denied any auditory hallucinations or visual hallucinations." If, on the expected date of discharge, a person is "a danger to himself or others," Dr. Pontejos-Murphy will not approve the discharge. Defendant had been scheduled to be released the day before, but was suicidal and "kept for another day."

Four days before the stabbings, defendant went to the Kaiser Oakland emergency department where he was seen by Dr. Yin Huang. Defendant told Huang he had suicidal ideations, was hearing auditory hallucinations, was homeless, and someone had stolen $800 from him and had thrown urine on him. Huang referred defendant to John George Psychiatric Pavilion on a Welfare and Institutions Code section 5150 hold. He was released the following day.

The day before the stabbings, defendant returned to the emergency department at Kaiser Oakland and was seen by Dr. Thomas Catron. Catron did not specifically remember the interaction, but his notes indicate defendant's "only concern" was that he had "twisted his ankle a week ago, and it wasn't feeling better." Catron ordered an X-ray, wrapped defendant's foot, gave him ibuprofen and acetaminophen, and released him.

After defendant was arrested, and during the following year, defendant was treated at the Santa Rita jail by Behavioral Health Clinician Ian Vianu.[6] Defendant told Vianu he "was feeling optimistic about the possibility of a not guilty by reason of insanity outcome in his court case." After several months, he was held in an isolated housing unit with "very limited contact" with other inmates. He claimed auditory hallucinations were "commanding" him to "get to the dorms and be around people." He was also designated as an "Intensive Observation Log" which is a "designation for inmates who are deemed high risk to themselves." This designation comes with "restrictions around what [inmates] are allowed to have in their cells and on their body." Defendant told Vianu that he wanted "off IOL" because he wanted to "have an undershirt, underwear, access to a razor, and . . . access to various paper inside of his cell."

---

[6] Defendant was held at Santa Rita beginning in the summer of 2018.

6

A few weeks later, defendant stated he was "no longer bothered" by auditory hallucinations and he had stopped taking his medication. Defendant told Vianu that although he was still having auditory hallucinations, he "kind of like[d] them; they are not bothering me; I'm not going to take my meds.'" He stated his court case "'could be going better, but he was still hopeful for a NGI verdict.'" Defendant once again expressed a desire to change housing units and became "verbally aggressive" toward Vianu for "not supporting him sufficiently in moving him to another housing unit." He also indicated "he needed to be moved off" his current unit because "a deputy had been threatening him." Vianu stated that over the course of his contact with defendant his auditory hallucinations were "'consistently inconsistent.'"

The following month, defendant told Vianu, "'a possible mental competency evaluation is quote/unquote so easy to ace the test.'" When Vianu asked him to clarify, he stated that he wanted "'to look crazy.'"

After nearly a year in custody, defendant was moved off the observation log and moved to a different unit with more contact. He was still not taking medication and remained in a "good mood." At the time Vianu left his position, in July 2019, defendant remained off of his medication.

Dr. Neal Edwards, a psychiatrist, testified he had treated defendant for a period of time while he was at Santa Rita jail. During that time, although defendant talked about his auditory hallucinations, he never "indicated a fixed delusion that somebody had kidnapped his grandmother and he needed to rescue her." Dr. Edwards stated there were "a lot of inconsistencies" in defendant's reporting of auditory hallucinations. Defendant was on medication until December 2018, when he no longer wanted to take anything.

*Defendant's Testimony*

Defendant testified that he has been diagnosed with schizoaffective, bipolar, amphetamine-type substance use, opioid use, and antisocial personality disorders, and depression. He had been arrested and placed on "a lot" of Welfare and Institutions Code section 5150 holds and had also served a two-year sentence at a state hospital.

When defense counsel asked defendant if he ever "experienced a delusion where you believe that you are seeing something that other people can't see," defendant responded, "Are you talking about fake skin?" When asked to clarify "fake skin," defendant said, "Fake skin, something that you put on your body, cut someone's else's skin off maybe, or understand that hologram means hazardous. It means why can't you explain to me why black skin and white skin are different. Like, are we in an area that you can't explain things anymore. So people say fake skin—fake skin aliens make fake skin on people; do surgery on people you don't know who the person is anymore that's surgery on their face, on their voice, so you don't recognize them. They have fake skin. Your parents look different. You don't know it's fake skin, fake people, fake skin."

Defendant also claimed he heard voices and said he remembered "hearing voices" after he was released from the state hospital, although he did not remember what the voices said.

On the day of the stabbings, he recalled "being threatened by three Black females that were together." He admitted to the stabbings, but asserted he had committed the acts because he thought all three were "going to assault my grandmother," and that they "said they had my grandmother

8

kidnapped."[7]  He believed the "women on the train were aliens" and claimed "they're involved in the kidnapping."

On cross-examination, defendant stated he believed the women "were gang members" and that he was "rescuing my family from gang members." He asserted "it's not illegal to aid, save, or rescue my family from a gang."  He admitted his grandmother was not on the train, and that he "didn't have a visual hallucination of [his] grandmother being assaulted."

Throughout portions of his cross-examination, defendant claimed not to remember.  He did not remember telling doctors "that most of the time [he] got 5150'd was because [he was] just looking for a place to sleep," that he had "never mentioned 'aliens' " or "fake skin" before in his "mental health treatment," or that he took heroin, methamphetamines, and drank "every day" before going to prison.  Nor did he remember that three days before the stabbings he told "mental health treatment providers . . . that [he] had no auditory or visual hallucinations."  And he did not remember telling the clinicians at jail that he "want[ed] to look crazy," that he " 'just want[ed] to go back to Atascadero so they can release me,' " and that he was "feeling optimistic about the possibility of not guilty by reason of insanity."

At one point during cross-examination, defendant refused to answer the prosecutor's questions, and the court recessed until the following day.

The next day, defendant refused to come to court, and the trial court ordered that "he be brought to court voluntarily or involuntarily."  Once defendant arrived, he once again refused to answer any questions and, instead, repeatedly accused the prosecutor of telling his attorney that he was

_____

[7]  Defendant's grandmother passed away in 2013.

9

not guilty. He then began yelling obscenities, at which point the court ordered him removed from the courtroom.[8]

*Other Witnesses*

Defendant's paternal aunt testified that even after defendant's grandmother had "passed in 2013, [defendant] would say that aliens were holding her hostage and we need to do something about it; they were going to kill her and they were torturing her." On cross-examination, she acknowledged that in her statement to the defense investigator, although she talked about defendant's mental health, she "never mentioned the word 'aliens' " or "skin suits."

Defendant's former neighbor testified she had known defendant since he was 15 years old, and she "watched [defendant] go from a troubled youth into a severely disturbed young adult." Defendant "became more violent; he became more out there, you know, just thinking really bizarre things." Over the 11 years she knew him, defendant "began to lose friends," and for a period of "about five or six months straight, if you wanted to talk to [him] . . . you had to open your mouth so he could inspect your teeth for transmitters." On cross-examination, the neighbor confirmed defendant was a "long-time drug addict."

*Defense Experts*

Dr. Jeremy Coles testified as a defense expert in forensic psychology during the guilt phase of the trial. Dr. Coles never met defendant because defendant refused to meet with him. Instead, Dr. Coles reviewed "about 10,000 pages or a little bit less of mental health documents." He opined

---

[8] We discuss the events pertinent to defendant's removal from the courtroom in more detail in connection with our discussion of the issue on appeal.

defendant was afflicted with schizophrenia, paranoid type. Generally, to "meet the criteria" for schizophrenia, a person must "show hallucinations, delusions, or disorganized speech. . . . One of those three has to be present, and then two other symptoms would be disorganized behavior, maybe like laughing to yourself or responding to internal stimuli, getting agitated for no reason." All of those things, among others, were "contained in [defendant's] record in many, many places."

Dr. Coles ruled out substance-induced psychotic disorder because defendant had been in prison for 16 months and his "symptoms never went away, and often got worse. And while there are definitely drugs in prison, it's unlikely that he had access to them both financially and he wasn't affiliated, so loners that are running around the prison with no money generally don't have access." Dr. Coles also ruled out antisocial personality disorder because although there was "antisocial behavior," Dr. Coles believed that could be "best explained by his schizophrenia." He opined that defendant was in "an acute and active episode of schizophrenia leading up to the offense" based on his "record in the period all the way up to a week before he committed these crimes," which included "persecutorial delusions; auditory hallucinations; telling him to hurt somebody; delusions about having breast implants; he wasn't taking his medication." Specifically, Dr. Coles stated that as defendant was experiencing those symptoms "in the time period leading up to the offense," it is "psychologically probable with pretty high certainty that some of that was going on; perhaps all of it at the time of the offense." Dr. Coles did not testify during the sanity phase of the trial, and, in fact, testified that while there was "ample evidence to conclude [defendant] was psychotic up through all of the records which come to right before the crime," he could not form an opinion "as to how that did or did not interact with what he did."

11

Dr. Jeffrey Gould also testified as a defense expert in psychiatry during the guilt phase. Dr. Gould opined defendant "suffers from a psychotic disorder," unspecified, meaning someone who "suffers from a psychotic illness, a chronic psychotic disorder, but there was either insufficient information or conflicting information available to determine one of the more specific psychotic disorders." Defendant's psychotic disorder was "separate from how substances likely exacerbated his symptoms during times he was using." Defendant had "documented occasions when he was having delusions about aliens" and "delusions involving people in fake skins or people being imposters." However, defendant did not "mention that his grandmother had been kidnapped" in regard to any of the references about "aliens." Dr. Gould also did not interview defendant, but reviewed "8,000 or 10,000 pages" of defendant's medical records from 2004 to 2018, the police report, and his criminal history record. He did not testify during the sanity phase, nor did he render any opinion on that subject.

## DISCUSSION

### Guilt Phase Issues

#### Competency: Changed Circumstances

In December 2018, proceedings were suspended after defense counsel declared doubt as to defendant's mental competency. The court appointed two alienists to perform an evaluation. One opined defendant was incompetent to stand trial (Dr. Marlin Griffith), while the other was unable to make a determination (Dr. John Chamberlin).

[REDACTED TEXT.]

The district attorney requested defendant be examined by a third alienist, Dr. Jason G. Roof. The court granted the request.

12

Dr. Roof opined defendant was competent to stand trial. [REDACTED TEXT.]

The parties submitted on the three alienists' reports. The court found Dr. Roof's report "to be the most . . . persuasive," and ruled defendant was competent to stand trial and reinstated the proceedings.

Five months later, defense counsel again declared doubt [REDACTED TEXT].

The court declined to suspend criminal proceedings, stating "there are two factors that I'm wrestling with in this case. One is the, shall I say, symptoms that [defendant] exhibited in his original reports from Chamberlain, Griffith, and Roof, were irrational, nonsensical, delusional statements. [¶] Now we have silence and refusal to cooperate, just shutting down essentially. So we have something that's different. But in each of those three reports, and most specifically in Dr. Roof's report, we have findings of malingering on the part of [defendant]. So if we have malingering—and maybe we still do, maybe we don't, I don't know—and we have a refusal to cooperate, the way I would look at it is my conclusion would be he's just not cooperating, he is—there's no new evidence of substantial change of circumstances or anything that gives in my mind serious doubt about the validity of the original competency finding, so I wouldn't order—I wouldn't reinstate competency proceedings."

Instead, the court appointed Dr. Roof to file a supplemental evaluation on whether proceedings should be suspended.

Dr. Roof opined there had been no substantial change of circumstances and no new evidence giving rise to a serious doubt about the validity of the original competency finding. [REDACTED TEXT.]

13

The trial court found there was "not substantial evidence as to [defendant's] incompetence, changed circumstances or new evidence as set forth on the record." The court based its determination on Dr. Roof's supplemental report and the court's "own observations of the defendant most recently" on entering his plea the week prior.

Three weeks after the trial court made its determination, defense counsel again declared doubt as to defendant's competency. In addition to the observations recounted in her prior affidavit, counsel wanted to put more examples on the record. Counsel's observations included: defendant "repeatedly smiling and laughing inappropriately, as if he's responding to internal stimuli"; defendant "trying to muffle a laugh and smiling while sitting at counsel table"; defendant appearing to have "full-on conversations as if there's another person present"; and defendant "sa[ying] loud things inappropriately in front of the potential jurors as they were walking in the courtroom" such as "I need to brush my teeth" or " 'she won't have sex with me.' "

Based on the court's "own observations of the defendant most recently and taking into consideration [Dr. Roof's] report," the court again found there were no "changed circumstances such as would require a suspension of the criminal proceedings."

Defendant maintains the court committed reversible error in failing to reinstate competency proceedings. He asserts that during the February 2020 hearing, his counsel presented substantial evidence that he was experiencing new and worsened symptoms, constituting a substantial change of circumstance in his mental condition.

A defendant is incompetent to stand trial if, "as a result of a mental health disorder or developmental disability, the defendant is unable to

14

understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a); see *People v. Parker* (2022) 13 Cal.5th 1, 28–29 (*Parker*).) Trial of an incompetent defendant violates both state and federal due process guarantees. (*People v. Smith* (2003) 110 Cal.App.4th 492, 499; see U.S. Const., 14th Amend.; Cal. Const., art. I, § 15.) Thus, "[a] person shall not be tried or adjudged to punishment . . . while that person is mentally incompetent." (§ 1367, subd. (a).)

" 'Penal Code section 1368 requires that criminal proceedings be suspended and competency proceedings be commenced if "a doubt arises in the mind of the judge" regarding the defendant's competence (*id.,* subd. (a)) and defense counsel concurs (*id.*, subd. (b)).' " (*People v. Wycoff* (2021) 12 Cal.5th 58, 82.)

However, "the duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence, and that when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground." (*In re Sims* (2021) 67 Cal.App.5th 762, 783.) "[W]hen a defendant has already been found competent to stand trial, ' "a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." ' " (*Ibid.*)

Further, "once a defendant has been found to be competent, even bizarre statements and actions are not enough to require a further inquiry." (*People v. Marks* (2003) 31 Cal.4th 197, 220 (*Marks*).) Nor is an appellate

15

court in a position " ' " 'to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper.' " ' " (*Ibid.*)

Accordingly, "[r]eviewing courts give great deference to a trial court's decision whether to hold a competency hearing." (*Marks, supra,* 31 Cal.4th at p. 220.) We review the trial court's finding of no substantial change of circumstances or no new evidence casting doubt on the validity of the initial competency determination for substantial evidence. (*People v. Huggins* (2006) 38 Cal.4th 175, 220.)

Citing to *People v. Easter* (2019) 34 Cal.App.5th 226 (*Easter*) and *People v. Tejeda* (2019) 40 Cal.App.5th 785 (*Tejeda*), defendant asserts counsel presented evidence of "different" and "inconsistent" symptoms than formed the "basis for the previous competency finding."

Both *Easter* and *Tejeda* rely in part on *People v. Jones* (1991) 53 Cal.3d 1115 (*Jones*) and *People v. Rodas* (2018) 6 Cal.5th 219 (*Rodas*).

In *Jones, supra,* 53 Cal.3d 1115, the defendant, during pretrial proceedings, was found competent to stand trial. (*Id.* at pp. 1128, 1132, 1153.) After trial, but before the court pronounced judgment, "defense counsel asked the court to suspend proceedings . . . to conduct a hearing to determine whether defendant was mentally competent." (*Id.* at p. 1152, fn. omitted.) Counsel explained that "for a substantial period of time defendant had been unable to assist in the preparation and defense of the case." Counsel "added that . . . a psychiatrist, was present and would so testify." The trial court declined to suspend proceedings. (*Id.* at p. 1152.)

On appeal, the defendant argued counsel's representations provided substantial evidence. (*Jones, supra*, 53 Cal.3d at p. 1152.) Our Supreme Court disagreed, explaining that although counsel asserted the defendant

16

was uncooperative, counsel "offered no facts to support that claim" nor did he offer any "explicit description of the testimony that [the psychiatrist] could offer." (*Id.* at p. 1153.) Further, "when . . . a competency hearing has already been held, the trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state. This is particularly true when . . . defendant has actively participated in the trial. The trial court had an opportunity to observe, and converse with, defendant throughout the trial itself and the posttrial proceedings. The court appropriately considered these observations in concluding that defendant's condition was essentially unchanged from the start of trial, when the court found him competent, to the time he was sentenced, when defense counsel asked that proceedings again be suspended." (*Ibid.*)

In *Rodas, supra,* 6 Cal.5th 219, 224, the defendant, at the outset of the proceedings, was found incompetent to stand trial. "After several months of treatment with antipsychotic medication, hospital physicians reported that defendant had regained trial competence." (*Id.* at p. 223.) This determination "was effectively conditioned" on defendant's continued use of his antipsychotic medication. (*Id.* at pp. 232, 235.) The trial court ruled defendant was competent and reinstated criminal proceedings. (*Id.* at p. 226.)

After jury selection, the trial court learned the defendant had stopped taking his medication, and defense counsel expressed doubt as to his competency. Counsel stated that the defendant had begun communicating incoherently, and had started exhibiting some of the same symptoms, namely "marked disorganization to his thinking, and " ' "speaking in nonsensical terms or word salad with legalistic flavor," ' " (*Rodas, supra*, 6 Cal.5th at

17

p. 224), which had led to earlier episodes of incompetence. Defendant had also changed his mind about wanting to testify. (*Id.* at pp. 227, 231.) After a brief colloquy with defendant, the court declined to reinstate competency proceedings. (*Id.* at p. 229.) The defendant testified, despite his counsel's advice to the contrary. The testimony was incoherent, and the trial court struck it as irrelevant. (*Id.* at pp. 223, 229.) The jury returned a guilty verdict. (*Id.* at p. 230.)

The Supreme Court concluded the trial court erred in failing to suspend the criminal proceedings after defense counsel expressed doubt as to the defendant's competency. (*Rodas, supra*, 6 Cal.5th at pp. 231–232.) The high court explained, "The effect of the *Jones* rule is simply to make clear that the duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence; when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground." (*Id.* at pp. 234–235.) In the instant case, however, the "evidence before the trial court made it unreasonable to continue to rely on the prior competence finding," because that finding was "based solely on" the defendant's continued use of his medication, and the trial court had learned the defendant had discontinued his medication and "was again displaying symptoms similar to those he exhibited during bouts of incompetence." (*Id.* at p. 235.)

With this background in mind, we turn to *Easter* and *Tejeda*.

In *Easter, supra*, 34 Cal.App.5th 226, defense counsel expressed doubt as to the defendant's competency to stand trial. (*Id.* at p. 230.) The court suspended criminal proceedings, and defendant was evaluated by two medical professionals, one finding him competent to stand trial, the other

finding him incompetent.  A jury found defendant competent, and the proceedings resumed.  (*Id.* at pp. 230–235.)

Six months after the competency hearing, defense counsel again expressed doubt as to defendant's competency.  (*Easter, supra,* 34 Cal.App.5th at p. 235.)  Counsel noted " 'a significant deterioration in [the defendant's] mental acuity.' "  Specifically, counsel stated defendant was " 'responding to . . . auditory hallucinations,' " which had been a " 'problem in the past, but it has become more acute,' " and there were new symptoms, including, " 'a serious decline in [the defendant's] personal hygiene' " and " 'the word "salad," ' " which counsel described as " 'a mixture of appropriate and inappropriate logical and fanciful responses to questions.' "  (*Id.* at pp. 235–236, 243.)  The trial court declined to reinstate competency proceedings, finding counsel's "offer of proof did not establish a substantial change of circumstances."  (*Id.* at p. 240.)  Less than a week later, the trial court again declined to reinstate competency proceedings because the defendant had understood everything that occurred at a recent *Marsden* hearing.[9]  (*Easter,* at p. 242.)

Citing to *Rodas*, a different division of this court reversed.  (*Easter, supra,* 34 Cal.App.5th at p. 229.)  The court noted, "the evidence of the new symptom [in *Rodas*]—defendant's ' "word salad" '—was similar to the evidence of the new symptom here, and in both cases defense counsel informed the court that the change in defendant's mental state, likely linked to his medication, prevented counsel from understanding what defendant was attempting to communicate."  (*Id.* at pp. 245–246.)  Additionally, "*Rodas*'s explanation of 'the *Jones* rule' makes clear that [the trial court's] later observations regarding defendant's mental state during a hearing on a

---

[9] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

19

motion in limine and a *Marsden* hearing could not obviate the necessity of a renewed competency hearing in the face of the evidence of new symptoms presented by [defense counsel]." (*Id.* at p. 246.)

In *Tejeda, supra*, 40 Cal.App.5th 785, the defendant was twice found incompetent to stand trial based on his "persistent belief that his actions were controlled by a 'mind control project' run by the federal government." (*Id.* at p. 787.) In both proceedings, a doctor opined defendant's delusions affected his ability to rationally assist counsel. "Whereas some criminal defendants malingered," or pretended to have a mental illness, Tejada, "was 'faking good'—i.e., hiding his delusions to be taken seriously." (*Id.* at pp. 789–790, 794.) When, years later, the trial court found the defendant had been restored to competency, "it did so on the premise that he understood his delusion was not relevant to his defense" and that he "could set aside" or compartmentalize "his delusions for purposes of assisting counsel." (*Id.* at pp. 790, 794.)

Several days into trial, the court held a *Marsden* hearing after the defendant expressed dissatisfaction with his counsel in that counsel failed to plead not guilty by reason of insanity. (*Tejeda, supra*, 40 Cal.App.5th at pp. 790–791.) At the hearing, counsel explained the defendant had recently told him "he 'never thought [his case] would get this far, because he thought Donald Trump would intervene,' " and that he wanted to testify and confess in order to " 'speak about why he did it as a result of a mind control program.' " (*Id.* at p. 794.) The trial court made inquiries of the defendant and then denied the motion. That same day, the defendant took the stand against counsel's advice and proceeded to deny having any mental illness and to admit to the crimes but maintained he did so because "he had been

20

controlled by the project" and needed money to "catch a plane to Langley to 'get to the bottom of this mind control project.' " (*Id.* at p. 791.)

Citing to *Rodas*, the Court of Appeal held the trial court committed error when it did not declare doubt as to the defendant's competency after it learned at the *Marsden* hearing of his anticipated testimony and then heard his actual testimony. (*Tejeda, supra*, 40 Cal.App.5th at p. 791.) As in *Rodas*, the appellate court concluded the trial court was "confronted with circumstances that were inconsistent with" assumptions on which the defendant's competency finding had been based, namely that his restoration to competency "was expressly premised on [the doctor's] belief that he could compartmentalize his delusion and keep it separate from his legal defense." Indeed, the trial court, in making the restoration to competency finding had "recognized the possibility that at 'some unspecified time in the future' [the defendant] might attempt to 'sabotage his own criminal case.' " (*Id.* at pp. 795–796.) Based on those facts, the appellate court held the trial court should have declared doubt and held a new competency hearing. (*Id.* at p. 796.)

Defendant maintains that, as in *Easter*, "here trial counsel 'provided unequivocal specifics about recent changes' " and that, as in *Tejeda*, "the evidence shows the new circumstances were *inconsistent* with the basis for the previous competency finding."

However, defendant's asserted symptoms were not new. [REDACTED TEXT.] And, unlike in *Easter* or *Tejeda*, where the competency determinations where conditioned on the defendant's continued use of antipsychotic medication or the defendant's belief that he could compartmentalize any delusions, here, there were no such conditions. [REDACTED TEXT.]

21

Defendant makes much of the fact that "trial counsel described appellant responding to internal stimuli and, *while unobserved*, having conversations with nonexistent others," which he says "should have obviated concerns about malingering." However, defendant had routinely self-reported hearing voices. Thus, counsel's report of defendant's "unobserved" conversations did not describe any "new" symptom.

In sum, given the trial court's own observations of defendant's behavior, and the additional report from Dr. Roof, we cannot say the trial court erred in declining to reinstate competency proceedings.

### *Defendant's Removal from the Courtroom*

Defendant maintains his convictions must be reversed because he was excluded from certain trial proceedings.

During the prosecutor's opening statement in the guilt phase, defendant was removed from court for disruptive behavior. The court read section 1043, subdivision (b)(1) to defendant and told him if he could promise that he would not continue to disrupt the proceedings, he would be allowed to return to court. Defendant agreed to comport himself.

That afternoon, defense counsel advised the court that the deputies had reported that defendant was refusing to come to court. The deputies also told counsel they had recorded his refusal on their personal digital recording devices (body cams). The court responded, "It appears [as] if your client is indeed requesting not to be present, that he may exercise that choice under 1043(a)(2), which is any prosecution for an offense which is not punishable by death and which the defendant is voluntarily absent. [¶] Do you agree that the defendant is exercising his option under that subdivision?" Defense counsel replied, "I wasn't present, but I have no reason to think that Deputy Ty and Deputy Townsend would lie." The prosecutor balked and asked that

22

the court obtain a court reporter and have the court reporter record defendant's refusal or review the recordings before finding defendant had voluntarily absented himself.  The court declined to do so.  Rather, it swore in Deputy Townsend, questioned him about the encounter with defendant, and gave defense counsel the opportunity to question him as well.  Defense counsel asked no questions.

Thereafter, defendant chose to absent himself, either waiving his appearance himself or through counsel.

Later, during the defense case, defendant chose to appear and testify on his own behalf.  However, during cross-examination, defendant began to refuse to answer the prosecutor's questions, instead, responding with comments like, "There's nothing I can do for you," or "You were rude to me." Following a recess during which defendant was not present, deputies notified the court he was again "refusing" to return to court.  The court ordered defendant brought to court "voluntarily or involuntarily."

Upon his arrival in the courtroom, and outside the presence of the jury, the court told defendant, "You are a witness now.  You have chosen to take the witness stand, therefore, you do not have a right to voluntarily be absent, so I'm ordering you to resume the witness stand and to testify."  Defendant responded, "He told me not guilty.  [¶]  What happens next?"  The court stated, "Well, you are still presumed innocent.  The trial is not over yet.  You have chosen to take the witness stand in your own defense.  You have not completed your testimony, so I'm ordering you to be present and to complete your testimony."

Shortly after cross-examination resumed, it again broke down. Defendant repeatedly asserted the prosecutor had told him and his attorney that he was "not guilty."  The court admonished defendant stating,

23

"Mr. Cowell, you have exercised your constitutional right to take the witness stand.  When that is done— [¶] . . . [¶] —he may cross-examine you."  However, defendant continued to assert that the prosecutor had told him he was "not guilty."  At one point, defendant began yelling obscenities, and the trial court ordered him removed from the courtroom.

That afternoon, outside the presence of the jury, the bailiff informed the court that defendant "wanted to come down to the courtroom."  The court told the bailiff to inform defendant, "he would be allowed to return to the courtroom, but that would be to resume the stand and to continue cross-examination."  The court continued, "I would state that Mr. Cowell will be allowed—in the completion of the case in this guilt phase, he would be required to take the stand to conclude his cross-examination.  And he would be allowed to do so as long as he is not disorderly, disruptive or disrespectful. [¶] If he is, then he would be removed after a warning like on prior occasions."

The next court day, the court observed that defendant had again refused to attend and stated he had been "removed from the courtroom . . . because of his courtroom conduct in disrupting the court.  I've informed counsel that if he comes back to court that he will be subject to . . . cross-examination."  Further, if defendant "persists in refusing to complete his cross-examination, I will entertain a motion to strike his testimony."

One day later, outside the presence of the jury, the court ordered that defendant be brought to court.  The court stated, "Mr. Cowell, when you were last in court, you were in the process of being cross-examined by the District Attorney.  [¶] During that cross-examination you conducted yourself in a disorderly, disruptive and disrespectful manner and I had you removed from the courtroom.  [¶] I informed your attorney that should you come back into

24

court, it would be for you to resume cross-examination so that that cross-examination and any redirect examination by your attorney might be completed, but that during it, you would be expected to conduct yourself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings.  [¶] . . .[¶]  . . . But if you choose not to conduct yourself with the decorum of courts and judicial proceedings, I would have you removed."  The court continued, "If you choose not to come at all for further cross-examination, I can consider taking sanctions including striking all the testimony that you have given and inform the jury not to consider that testimony in deciding your guilt or innocence.  [¶] So the choice is yours."  Defendant declined to retake the stand, and the trial court proceeded to hear from counsel regarding appropriate sanctions.

The following morning, the court asked the bailiff to "inform [defendant] that he will not be expected to take the stand, and to ask him again if he wants to come to court.  At that point, defense counsel stated, "Your Honor, I'm willing to stipulate if the Court wants to, that what's already done is sufficient for him to show that he's absenting himself from the trial, unless if the Court wants to do it for clarification."  The court responded, "I think it should be made clear to him, because in case he later claims that he was threatened to take the stand, and that's the reason that he didn't come to court.

### *Constitutional Right to Be Present*

A criminal defendant has the right under state and federal Constitutions "to be personally present with counsel" at every critical stage of the trial.  (Cal. Const., art. I, § 15; *People v. Rundle* (2008) 43 Cal.4th 76, 133

(*Rundle*);[10] *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 465 (*Bryant*).)  A critical stage is "one in which a defendant's ' "absence might frustrate the fairness of the proceedings" [citation], or "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." ' " (*Rundle*, at p. 133; *Bryant*, at p. 465.)

However, a "defendant may waive his or her constitutional right to be present during a critical stage, provided the waiver is knowing, intelligent, and voluntary." (*Rundle, supra,* 43 Cal.4th at pp. 133–134.)

Defendant complains that the trial court unlawfully "conditioned" his right to be present "on his willingness to be cross-examined."

However, as we have recited in detail, the court did not condition defendant's presence in court on the completion of cross-examination. Rather, it removed defendant from the courtroom several times because he conducted himself in a "disorderly, disruptive and disrespectful manner," including while being cross-examined by the prosecutor.  A defendant has no constitutional right to engage in disruptive behavior, and a trial court does not infringe a defendant's constitutional rights to be present by telling a defendant that he cannot remain in court unless he comports himself appropriately.  (See *People v. Medina* (1995) 11 Cal.4th 694, 738.)

That defendant put himself in the position of having his testimony stricken due to his refusal to permit cross-examination is an entirely different issue.  Any witness who takes the stand and gives direct testimony must, as a matter of due process to the opposing party, submit to cross-examination, and if they do not, their direct testimony is subject to being stricken.  (See, e.g., *Jenkins v. Anderson* (1980) 447 U.S. 231, 236, fn. 3 [" 'a defendant who takes

---

[10] Overruled on another ground as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22.

26

the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination' "]; *Brown v. United States* (1958) 356 U.S. 148, 155 [criminal defendant " 'has no right to set forth to the jury all the facts which tend in his favor without laying himself open to cross-examination upon those facts' "]; *People v. Reynolds* (1984) 152 Cal.App.3d 42, 46 (*Reynolds*) [defendant's refusal to answer relevant questions may deprive prosecution of right to subject defendant's claims "to 'the greatest legal engine ever invented for the discovery of truth,' cross-examination"].)

Thus, the trial court did not abridge defendant's right to be present by telling him that, having chosen to testify on his own behalf, he was subject to cross-examination by the prosecution, and if he persisted in thwarting cross-examination, the court could properly strike his testimony on direct. This was not coercion or a threat by the court. Rather, it was a correct statement of the law. (See, e.g., *Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 735–736 (*Fost*) [where witness " 'refuses to submit to proper cross-examination regarding material issues, the striking out or partial striking out of direct testimony is common, and has been allowed even where the result was to deprive a criminal defendant of the fundamental constitutional right to testify in his own behalf,' " quoting *Reynolds, supra,* 152 Cal.App.3d at pp. 47–48].)

Furthermore, the court's final exchange with counsel emphasized that the issue with respect to attendance was not whether defendant would allow the prosecutor to complete cross-examination—the court assumed he would not do so. Rather, the issue was whether he would comport himself appropriately, and the court wanted to ensure that defendant understood that *that* was what was required of him to return to court.

27

As for those instances in which defendant simply refused to attend, he either waived his appearance himself, or did so through counsel. In addition, counsel agreed at one point that defendant had exercised his right to "absent himself" from court and, during the final colloquy with the court, counsel was prepared to stipulate that defendant was voluntarily "absenting himself" from trial.

In sum, defendant's constitutional rights to be present were not conditioned on his allowing the prosecutor to complete cross-examination. Rather, his being present was conditioned, and permissibly so, on his comporting himself appropriately. As for those times defendant simply refused to attend, he voluntarily waived his right to be present. Thus, there was no violation of defendant's constitutional rights to be present.

### *Statutory Right to Be Present*

Defendant further contends, for the first time on appeal, that even if he knowingly waived his constitutional rights to be present, he did not—because he legally could not—waive his statutory rights under sections 977 and 1043 to be present.

Section 977, subdivision (b)(1) states: "[I]n all cases in which a felony is charged, the accused shall be physically present . . . during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be physically or remotely present at all other proceedings unless [he or she] waive[s] [his or her] right to be physically or remotely present, with leave of court and with approval by defendant's counsel." Section 1043, subdivision (b) states: "The absence of the defendant in a felony case after the trial has commenced in [his] physical presence shall not prevent continuing the trial to, and including, the return of the verdict in any of the following cases: [¶] (1) Any case in which the

28

defendant, after being warned by the judge that [he] will be removed if [he] continues [his] disruptive behavior, nevertheless insists on acting in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with the defendant present in the courtroom. [¶] (2) Any prosecution for an offense *which is not punishable by death* in which the defendant is voluntarily absent." (Italics added.)

As our high court has explained, " 'when read together, sections 977 and 1043 permit a capital defendant to be absent from the courtroom only on two occasions: (1) when he has been removed by the court for disruptive behavior under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1). However, section 977, subdivision (b)(1), the subdivision that authorizes waiver for felony defendants, expressly provides for situations in which the defendant cannot waive his right to be present, including during the taking of evidence before the trier of fact. Section 1043, subdivision (b)(2), further makes clear that its broad "voluntary" exception to the requirement that felony defendants be present at trial does not apply to capital defendants. Thus, [a] trial court, by permitting a nondisruptive capital defendant to be absent during the taking of evidence, commit[s] error under sections 977 and 1043." (*People v. Jackson* [(1996)] 13 Cal.4th [1164,] 1210.) 'The Legislature evidently intended that a capital defendant's right to voluntarily waive his right to be present be severely restricted.' (*Id.* at p. 1211.)" (*People v. Weaver* (2001) 26 Cal.4th 876, 967–968 (*Weaver*); accord, *People v. Bloom* (2022) 12 Cal.5th 1008, 1059; *Rundle, supra,* 43 Cal.4th at p. 135 [court "stress[es] that a defendant's statutory ability to waive his presence in a capital case is more circumscribed than the associated ability to waive his constitutional right" to be present].)

29

However, such error, "being merely statutory," will be reversed only if " ' "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* [(1956)] 46 Cal.2d 818, 836.)' (*People v. Jackson, supra,* 13 Cal.4th at p. 1211.)" (*Weaver, supra,* 26 Cal.4th at p. 968; accord, *Rundle, supra,* 43 Cal.4th at p. 134.)

The parties dispute whether the "capital defendant" rule established by these statutory provisions applies here. While defendant was charged with a special circumstance murder, an offense punishable by death, the prosecution did not seek the death penalty.

Defendant cites to *In re Bright* (1993) 13 Cal.App.4th 1664, 1670 (*Bright*). In *Bright*, the petitioner sought "writ review of an order of the trial court denying [him] pretrial bail in a pending prosecution for murder with special circumstances." (*Id.* at p. 1665.) The Court of Appeal concluded that "regardless of whether the People actually seek the death penalty, bail properly may be denied whenever the accused is charged with an offense statutorily punishable by death and the 'facts are evident or the presumption [of guilt is] great.' " (*Id.* at p. 1666.)

The Attorney General cites to *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 317–318 (*Corenevsky*). In *Corenevsky*, the petitioner sought writ review of an order denying him state-funded ancillary defense services and assistance of additional appointed counsel pursuant to section 987.9. (*Corenevsky,* at pp. 312, 315.) Our Supreme Court held that " '[in] those murder cases . . . in which the death penalty will not be sought, even though the offense charged is statutorily punishable by death, section 987.9 is inapplicable.' " (*Id.* at p. 317.)

We think the Attorney General probably has the better argument, but neither party has cited a case that is on point, and, on this record, we need not, and do not, decide whether the "capital defendant" rule established by sections 977 and 1043 applies only to cases in which the death penalty is actually sought. Even assuming defendant did not forfeit this statutory rule by failing to raise it below (see *Rundle, supra,* 43 Cal.4th at p. 135), and even assuming the trial court violated these statutory provisions, it is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."[11] (*Watson, supra,* 46 Cal.2d at p. 836.)

To begin with, defendant was present during parts of the trial. He was absent during his aunt's testimony and maintains that had he been present, he "could have helped his attorney rehabilitate her on re-direct by addressing some of" the matters with which the prosecutor sought to impeach her. He was also absent during the testimony of his treating doctors, and again claims that had he been present, he "could have assisted his attorney in real time in responding to the cross-examination." However, these generic assertions of supposed assistance, devoid of any detail, are sheer speculation and of no evidentiary value. (See *Rundle, supra,* 43 Cal.4th at p. 136 ["no evidence in the record that defendant might have assisted counsel in some other manner had he been present" during his mother's testimony].)

---

[11] Defendant incorrectly maintains the prejudicial error standard of *Chapman v. California* (1967) 386 U.S. 18, 23, controls. Our Supreme Court has made it abundantly clear that any error under sections 977 and 1043 is subject to the *Watson* harmless error standard. (E.g., *Rundle, supra,* 43 Cal.4th at p. 134; *Weaver, supra,* 26 Cal.4th at p. 967; *People v. Jackson, supra,* 13 Cal.4th at p. 1211.)

Furthermore, as we have recited, the evidence against defendant was overwhelming. (See *Rundle, supra,* 43 Cal.4th at p. 135 ["guilt phase evidence against [the defendant] was overwhelming"].) This included his own testimony that he stabbed N.W. and L.W. (which the trial court allowed to remain standing during the guilt phase despite his refusal to answer questions on cross-examination). In addition, L.W. and T.W. both testified. The jury also saw video footage of defendant at the BART stations, some of which showed defendant following the sisters onto the train at the Concord station and again at the MacArthur station. The evidence was also undisputed that after the stabbing, defendant left the scene, took off the hoodie he was wearing, changed his pants, put the knife and his backpack in different locations, and boarded a bus.

Finally, the trial court, early in the proceedings, admonished the jury that it was not to consider whether defendant was present in court or not, stating, "Ladies and gentlemen, Mr. Cowell is absent this morning. I want to instruct you that you are not to speculate as to the reason and are not to let his absence enter into your decision-making in this trial in any way." We, of course, must presume that the jurors understood and followed the court's instructions. (*People v. Pearson* (2013) 56 Cal.4th 393, 414.)

### *Instructional Error*

Defendant also claims the trial court erred in connection with the jury instructions on the lying-in-wait special circumstance. As we explain, his argument is based on a misunderstanding of differences between first degree murder, including lying-in-wait murder, and the special circumstance of lying in wait.

We first discuss the instructions the court gave. With respect to murder, the trial court instructed the jury, in pertinent part:

32

"The defendant is charged in count 1 with murder in violation of Penal Code section 187. [¶] To prove that the defendant is guilty of this crime, the People must prove that: One, the defendant committed an act that caused the death of another person; and, two, when the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he intended to kill. The defendant acted with implied malice if, one, he intentionally committed an act; two, the natural and probable consequences of the act were dangerous to human life; three, at the time he acted, he knew his act was dangerous to human life; and four, he deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in the next instruction." (See CALCRIM No. 520.)

"The defendant has been prosecuted for first degree murder under two theories: One, the murder was willful, deliberate, and premeditated; and two, the murder was committed while lying in wait or immediately thereafter. [¶] Each theory of first degree murder has different requirements, and I will instruct you on both. [¶] You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved that the defendant committed murder. But all of you do not need to agree on the same theory.

"The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act that caused death.

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may

vary from person to person according to the circumstances. A decision to kill made rashly, impulsively or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

"The defendant is guilty of first degree murder if the People have proved that the defendant murdered while lying in wait or immediately thereafter. The defendant murdered by lying in wait if: One, he concealed his purpose from the person killed; two, he waited and watched for an opportunity to act; and, three, then, from a position of advantage, he intended to and did make a surprise attack on the person killed. [¶] The lying in wait does not need to continue for any particular period of time, but its duration must be substantial enough to show a state of mind equivalent to deliberation and premeditation." (See CALCRIM No. 521.)

As these instructions make clear, although willful, deliberate and premeditated murder and lying-in-wait murder are both species of first degree murder, there is a significant distinction between the two theories. Whereas willful, deliberate and premeditated murder requires proof of a specific mental state (*People v. Nelson* (2016) 1 Cal.5th 513, 544–545 (*Nelson*); *People v. Townsel* (2016) 63 Cal.4th 25, 62 (*Townsel*)), lying-in-wait murder does not (*People v. Flinner* (2020) 10 Cal.5th 686, 748 (*Flinner*) ["implied malice" suffices for conviction of lying-in-wait murder]; *People v. Streeter* (2012) 54 Cal.4th 205, 246 ["lying-in-wait murder requires only a wanton and reckless intent to inflict injury likely to cause death"], overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834).

The remainder of the elements of lying-in-wait murder—the defendant's concealing his purpose from the person killed, waiting and watching for an opportunity to act, and from a position of advantage, intending to and making a surprise attack on the person killed—pertain to proving the physical act of killing while lying in wait or immediately

34

thereafter. While proof of lying in wait serves " 'as the functional equivalent of proof of premeditation, deliberation, and intent to kill' " (*People v. Sandoval* (2015) 62 Cal.4th 394, 416 (*Sandoval*)), it is the "functional equivalent" in terms of heinousness, justifying classification of lying-in-wait murder as first degree murder. (*Ibid.* [lying in wait "is a means of proving first degree murder"].) The elements of the act of lying in wait, itself, are not requirements of, and do not establish, a specific intent requirement. (See *Flinner, supra,* 10 Cal.5th at p. 748; *Streeter, supra,* 54 Cal.4th at p. 246.) Thus, these elements are not the *same* as the specific intent requirement of intent to kill with willfulness, premeditation, and deliberation. (See *Nelson, supra,* 1 Cal.5th at pp. 544–545; *Townsel, supra,* 63 Cal.4th at p. 62; see also *People v. Ruiz* (1988) 44 Cal.3d 589, 614 (*Ruiz*) [rejecting argument that "premeditation, deliberation and intent to kill must be independently proved" to prove lying-in-wait murder].)

As for the special circumstance of lying in wait, the court instructed in pertinent part:

> "If you find the defendant guilty of first degree murder, you must also decide whether the People have proved that the special circumstance is true. [¶] The People have the burden of proving the special circumstance beyond a reasonable doubt. If the People have not met this burden, you must find the special circumstance has not been proved." (See CALCRIM NO. 700.)

> "In order to prove the special circumstance of lying in wait, the People must prove not only that the defendant did the act charged, but also that he acted with a particular intent or mental state. The instruction for the special circumstance explains the intent or mental state required. [¶] An intent or mental state may be proved by circumstantial evidence. [¶] Before you may rely on circumstantial evidence to conclude that the defendant had the required intent or mental state, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to conclude that the

35

defendant had the required intent or mental state, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent or mental state. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports the finding that the defendant did have the required intent or mental state and another reasonable conclusion supports a finding that the defendant did not have the required intent or mental state, you must conclude that the required intent or mental state was not proven by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (See CALCRIM No. 705.)

"The defendant is charged with the special circumstance of murder committed while lying in wait in violation of Penal Code section 190.2(a)(15). To prove that this special circumstance is true, the People must prove that: One, the defendant intentionally killed [N.W.]; and two, the defendant committed the murder by means of lying in wait. [¶] A person commits a murder by means of lying in wait if: He or she concealed his or her purpose from the person killed; two, he or she waited and watched for an opportunity to act; three, then he or she made a surprise attack on the person killed from a position of advantage; and four, he or she intended to kill the person by taking the person by surprise. [¶] The lying in wait does not need to continue for any particular period of time, but its duration must be substantial and must show a state of mind equivalent to deliberation or premeditation. [¶] The defendant acted deliberately if he carefully weighed the considerations for and against his choice and knowing the consequences decided to kill. The defendant acted with premeditation if he decided to kill before committing the act that caused death. [¶] A person can conceal his or her purpose even if the person killed is aware of the person's physical presence. [¶] The concealment can be accomplished by ambush or some other secret plan." (See CALCRIM No. 728.)

As these instructions reflect, the fundamental distinction between lying-in-wait murder and the special circumstance of lying in wait is that, unlike lying-in-wait murder, the special circumstance of lying in wait requires "intent to kill." (*People v. Cage* (2015) 62 Cal.4th 256, 278 (*Cage*)

36

[" 'the lying-in-wait special circumstance requires intent to kill, while lying-in-wait murder requires only a wanton and reckless intent to inflict injury likely to cause death' "]; see *Flinner, supra,* 10 Cal.5th at p. 748 ["[t]he lying-in-wait special circumstance . . . requires the additional element that the killing was intentional, not merely committed with implied malice"]; *People v. Casares* (2016) 62 Cal.4th 808, 832–833 (*Casares*) [special circumstance requires a "lethal" intent], disapproved on another ground as stated in *People v. Dalton* (2019) 7 Cal.5th 166, 214; *People v. Johnson* (2016) 62 Cal.4th 600, 633 (*Johnson*) [evidence supported finding defendant acted "with the intent that [the victim] would die"].)[12]  In all other respects, the elements that

---

[12]  Prior to March 2000, there was also a slight distinction between lying-in-wait murder and the special circumstance of lying in wait in terms of the timing between the act of lying in wait and the act of killing.  As our Supreme Court has explained,

> " '[I]n March 2000, the voters passed Proposition 18, which changed the definition of the lying-in-wait special circumstance from a killing *while* lying in wait to a killing *by means of* lying in wait, mirroring the language of the first degree murder statute.' (*Johnson, supra,* 62 Cal.4th at p. 634.)  '[T]he voters' purpose in amending the lying-in-wait special circumstance was to eliminate the temporal distinction between the special circumstance and lying-in-wait first degree murder . . . thereby expand[ing] the class of cases in which the special circumstance could be found true . . . .' (*Id.* at p. 636.)  Nevertheless, we concluded that the amended lying-in-wait special circumstance comports with the Eighth Amendment because it 'adequately distinguishes itself from other murders and does so in terms that are not so vague as to permit arbitrary determinations regarding the truth of the special circumstance allegation.' (*Johnson,* at p. 636.)  As we have long held, the 'factual matrix' presented by the lying-in-wait special circumstance—an intentional murder coupled with the elements of concealment, watching and waiting, and a surprise attack from a position of advantage—sufficiently distinguish it from ' "ordinary" premeditated murder' [citation], such that it is 'neither applicable to all murderers nor impermissibly vague' (*Johnson,* at p. 636).  And, in *Johnson,* we reasoned that even if Proposition 18

37

establish the act of lying in wait—defendant's concealing his purpose from the person killed, waiting and watching for an opportunity to act, and from a position of advantage, intending to and making a surprise attack on the person killed—are the same for the crime of murder and the special circumstance. (See *Flinner, supra,* 10 Cal.5th at p. 748 ["[t]he lying-in-wait special circumstance [citation] includes the elements of first degree lying-in-wait murder"].)

The trial court also gave the following introductory instruction based on CALCRIM No. 252:

> "The following crimes and allegations require a specific intent or mental state: Murder, as charged in count 1; the special circumstance of lying in wait, as alleged in Count 1; attempted murder, as charged in Count 2; and the allegation of willful, deliberate, premeditated attempted murder, as charged in Count 2. For you to find a person guilty of these crimes or to find the allegations true, that person must not only commit the prohibited act, but must do so with the specific intent or mental state. The act and the specific intent or mental state required are explained in the instruction for that crime or allegation."

Thus, the trial court correctly instructed that only willful, deliberate, and premeditated first degree murder, the special circumstance of lying in wait, and attempted willful, deliberate, and premeditated murder required proof of a specific intent.

On appeal, defendant takes issue with the court's instruction based on CALCRIM No. 627. This instruction is entitled "Hallucination: Effect on

---

had rendered the special circumstance *identical* to lying-in-wait first degree murder, the special circumstance would pass constitutional scrutiny because lying-in-wait murder 'historically has been viewed as " 'a particularly heinous and repugnant crime,' " ' which 'provides "a rational basis for distinguishing those murderers who deserve to be considered for the death penalty from those who do not." ' (*Johnson*, at p. 637)" (*Flinner, supra,* 10 Cal.5th at pp. 751–752.)

38

Premeditation," and is one of the instructions in CALCRIM Chapter I, which includes instructions on "Impairment Defense." The trial court gave the following version of the instruction, modified to refer not only to "hallucination" but also to "delusion":

> "A hallucination is a perception not based on objective reality. A delusion is a belief not based on objective reality. In other words, a person has a hallucination or delusion when that person believes that he or she is seeing or hearing or otherwise perceiving something that is not actually present or happening.
>
> "You may consider evidence of hallucinations or delusions, if any, in deciding whether the defendant acted with deliberation and premeditation.
>
> "The People have the burden of proving beyond a reasonable doubt, as to Count 1, that the defendant acted with deliberation and premeditation to prove that theory of first degree murder, and, as to Count 2, the allegation that the attempted murder was done with deliberation and premeditation. If the People have not met this burden, you must not find the defendant guilty of first degree murder on the theory that he acted with deliberation and premeditation and you must not find true the allegation that the attempted murder was done with deliberation and premeditation."

Thus, as the instruction expressly stated, it was pertinent only to willful, deliberate, and premeditated murder (and to attempted willful, deliberate, and premeditated murder).

Prior to the giving of this instruction the following colloquy had occurred between defense counsel and the court (italics added for emphasis):

> "[Defense Counsel]: [T]he problem, as I see it with 627 as written by the Court, is that you are only allowing them to consider hallucinations and delusions as it applies to the premeditation and deliberation theory of first degree murder and are precluding it from going towards the premeditation and deliberation that's required for *the lying in wait theory of first degree murder*.

39

"[The Court]: Well, that's—I did that because—well, number one as to that theory of lying in wait, the mental state of deliberation and premeditation is not required to be shown.  Instead, only a duration equivalent—only a duration sufficient to allow for deliberation or premeditation, and I emphasize the disjunctive is required.  And so I purposely did not include lying in wait as something that could be affected by delusion or hallucination.

"[Defense Counsel]: I don't mean to split hairs . . . , but according to 521, just reading from it directly now, what requires to be shown is a duration that's substantial enough to show a state of mind equivalent to deliberation and premeditation.  [¶] . . . [¶]  Or premeditation.  And I'm not taking issue with the 'or' or 'and.'  What I'm taking issue is when you take a look at the record that's before this court, I don't think that it would be—my position to the jury is that *I don't think any duration is long enough if you've got total delusional brain to show premeditation and deliberation.*  And I think that—what this lying in wait theory is getting at is there can be a period long enough to be the equivalent of premeditation and deliberation.  And if what's going on in your brain is what John Cowell has indicated is going on in his brain, then he could have 10 days to think about these acts, but he's not formulating premeditation and deliberation.  And I think that that's the state of the law, and I believe that the way the instructions are being formulated, I'm being precluded from arguing that.

"[The Court]: Well, I disagree with you.  I don't think it is the law.  I think that for a theory of lying in wait that it's not required that the person who might qualify under the so-called *Morales*[13] factors of lying in wait is required to have a mental state equivalent to either premeditation or deliberation.  All that is required is that there be a concealment of purpose, a substantial period of watching and waiting for an opportune time to act and immediately a surprising attack on an unsuspecting victim from a position of advantage or surprise."

As this exchange makes clear, the court and defense counsel were

discussing the instruction in reference to the first degree murder theories

---

[13]  *People v. Morales* (1989) 48 Cal.3d 527, disapproved on another ground as stated in *People v. Williams* (2010) 40 Cal.4th 405, 458–459..

being pursued by the prosecution, and defense counsel urged the court to treat *lying-in-wait murder* as though it required premeditation, as did the crimes of willful, deliberate, and premeditated first degree murder and attempted willful, deliberate, and premeditated first degree murder. In other words, counsel advanced the argument that the Supreme Court's statement that the requirements of the act of a lying in wait killing serve as "the functional equivalent of proof of premeditation, deliberation, and intent to kill" (*Sandoval, supra,* 62 Cal.4th at p. 416), means these requirements are the *same* as premeditation, deliberation, and intent to kill.

As we have discussed, the trial court correctly ruled that defense counsel was mistaken. Lying-in-wait murder does not require proof of premeditation (or any other component of the mental state of willful, deliberate, and premeditated first degree murder), but rather requires proof only of implied malice. (*Flinner, supra,* 10 Cal.5th at p. 748; *Streeter, supra,* 54 Cal.4th at p. 246; see *Ruiz, supra,* 44 Cal.3d at p. 614.)

On appeal, defendant does not take issue with the court's refusal to modify CALCRIM No. 627 to make it pertinent to lying-in-wait murder. Rather, he urges that the instruction should have been modified to make it pertinent to the special circumstance of lying in wait because the special circumstance, unlike lying-in-wait murder, requires a specific intent.

To begin with, since defendant did not raise this issue in the trial court and did not ask that the instruction be so modified, he has forfeited the issue on appeal. (See *People v. Grimes* (2016) 1 Cal.5th 698, 724; *People v. Rangel* (2016) 62 Cal.4th 1192, 1223.)[14]

_____

[14] This is not a case where the instruction as given incorrectly stated the law and thus defendant was excused from objecting and requesting that the instruction be modified. (See *People v. Cordova* (2015) 62 Cal.4th 104, 149.)

But even if the issue was not forfeited, his argument on appeal is meritless. He starts by asserting the "watching and waiting time"—i.e., the elements of the act of lying in wait—must be " 'substantial' " to " 'distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse,' " quoting *People v. Mendoza* (2011) 52 Cal.4th 1056, 1073 (*Mendoza*).[15] He then asserts, "[a]s such, the defendant must act with at least a similar degree of consideration and planning as necessary to find premeditation or deliberation"; "[i]ndeed, '[l]ying in wait is the functional equivalent of proof of premeditation, deliberation, and intent to kill,' " quoting *People v. Stanley* (1995) 10 Cal.4th 764, 794–795.) "Since symptoms of mental illness such as delusions or hallucination are relevant to determining whether a defendant actually premeditated or deliberated . . . they are," says defendant, "necessarily relevant to determine whether the defendant acted with the equivalent mental state required for lying in wait."

In other words, defendant is making the same argument on appeal that he advanced in the trial court, namely that the required elements of the act of lying in wait, itself, are the *same* as premeditation and deliberation. As we have discussed, that is not the law. To the contrary, the required elements of the act of lying in wait, itself, are the *same* for lying-in-wait murder (which has no specific intent requirement) and the special circumstance of lying in wait (which does require special intent, namely the intent to kill). Thus, while these elements establish conduct so reprehensible it is properly classified as first degree murder—and in this respect are the "functional equivalent" of "proof of premeditation, deliberation, and intent to kill"—they

---

[15] As our high court has more recently stated, the act of lying in wait is what distinguishes this form of murder from killings committed only on rash impulse and appropriately makes lying-in-wait murder a species of first degree murder. (See *People v. Sandoval, supra,* 62 Cal.4th at p. 416.)

are not the *same* as premeditation, deliberation, and intent to kill. (See *Ruiz, supra,* 44 Cal.3d at p. 614.) Since CALCRIM No. 627 pertains only to "premeditation," counsel's argument that even if the instruction is not pertinent to lying-in-wait murder, it is pertinent to the special circumstance of lying in wait, misses the mark.

Defendant also points out that the special circumstance of lying in wait requires intent to kill. However, intent to kill is not the same as willful, premeditated, and deliberate intent to kill. (See *Mendoza, supra,* 52 Cal.4th at p. 1069 [" '[a] verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill' "], quoting *People v. Sanchez* (2001) 26 Cal.4th 834, 849; *People v. Chiu* (2014) 59 Cal.4th 155, 166 ["First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a heightened penalty."], superseded on other grounds as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3.)

In sum, CALCRIM No. 627 is an instruction that pertains to willful, deliberate, and premeditated first degree murder (or attempted willful, deliberate and premeditated first degree murder). It does not pertain to lying-in-wait murder, let alone the special circumstance of lying in wait.

Defendant next contends the trial court's asserted error in refusing to modify CALCRIM No. 627 to pertain to the special circumstance of lying in wait was "reinforced" by the court's giving of CALCRIM No. 3428. Since the trial court, as we have explained, did not err in refusing to modify CALCRIM No. 627, defendant's claim of "reinforcement" goes nowhere.

CALCRIM No. 3428 is entitled "Mental Impairment: Defense to Specific Intent or Mental State (Pen. Code, § 28)." The trial court instructed

43

the jury as follows and gave this instruction immediately following the

CALCRIM No. 627 instruction:

> "You have heard evidence that the defendant may have suffered from a mental disease or disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime.
>
> "The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically: deliberately and with premeditation. If the People have not met this burden, as to Count 1, you must find the theory that the defendant acted deliberately and with premeditation has not been proved and, as to Count 2, you must find the allegation that the attempted murder was done with deliberation and premeditation has not been proved."

Prior to the court's giving this instruction, defendant objected in writing as follows: "The defense objects to the pinpoint addition (middle paragraph) included in this instruction. This instruction appears to elucidate for the jury the difference between diminished capacity and diminished actuality. Because both of the defense experts testified consistently with the law, there is no need for this pinpoint instruction. Including this instruction risks confusing the issues for the jury. [¶] The defense requests that the last paragraph in this instruction include the following language: 'The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically: the intent to kill. . . .' (*People v. Ocegueda* (2016) 247 Cal.App.4th 1393.)"

At the conference on instructions the following colloquy took place:

> "[The Court]: On 3428, the request is to include intent to kill. In this case, I find no substantial evidence that would be required for the giving of an instruction that John Cowell's mental state interfered or diminished in any respect his capacity to intend to kill. And to the

44

contrary, it would appear that they would accept that he was deluded at the time; that his delusion drove him to an intent to kill, so I will decline to include intent to kill in 3428.

[¶] . . . [¶]

"[Defense Counsel]: My understanding of the testimony given by Mr. Cowell was that he believed that the women were wearing skin suits, and I believe that there's at least some implication that the assault that took place on the BART platform was an effort to remove the skin suit. And if that was the case, then I believe that there wouldn't be an intent to kill because his delusion led him to believe that he wasn't killing, but that he was removing a skin suit. And so for that reason, I do ask the Court to give 3428 towards intent to kill.

"[The Court]: Well, I think that inference, if it rises to that, is belied by his testimony that he intended to prevent them from kidnapping his grandmother, so I will decline to include intent to kill in 3428."

In his briefing on appeal, defendant does not address the trial court's reason for refusing to add "intent to kill" to the CALCRIM No. 3428 instruction. He has therefore forfeited any argument that the trial court erred in refusing to modify the instruction as requested. (See *Thompson v. County of Los Angeles* (2006) 142 Cal.App.4th 154, 171 [appellant forfeited argument that evidence was improperly excluded by failing to address trial court's reason for refusing to admit it].) Indeed, as we have recited, he argues only that the CALCRIM No. 3428 instruction "reinforced" the asserted error in the CALCRIM No. 627 instruction. However, as we have explained, the CALCRIM No. 627 instruction correctly stated the law.

We further observe that, even if defendant had, on appeal, challenged the trial court's ruling as to the CALCRIM No. 3428 instruction, and even if the court erred in not including "specific intent" in the instruction, any such error was harmless under the reasoning of *Townsel, supra*, 63 Cal.4th 25, which defendant cites for the proposition that evidence of mental disease or

45

defect is relevant not only to premeditation and deliberation, but "any other specific intent," including any specific intent required by any special circumstance.

In *Townsel,* the trial court gave the analogous CALJIC instruction, and instructed the jury it could consider evidence that the defendant suffered from a "mental defect or mental disorder" at the time of the charged murders, and it could consider such evidence "solely for the purpose of determining whether or not [the defendant] actually formed the mental state which is an element" of the charged crimes. (*Townsel, supra*, 63 Cal.4th at p. 59.) The defendant claimed the instruction precluded the jury from considering the evidence in connection with whether he acted with premeditation and deliberation, and in connection with whether he formed the specific mental states required to find him guilty of the crime of dissuading a witness and to find true the witness-killing special circumstance. (*Id.* at pp. 57–59.)

Our Supreme Court concluded the instruction given did not preclude consideration of the mental state evidence in connection with any of the elements of first degree murder, including premeditation and deliberation. (*Townsel, supra*, 63 Cal.4th at pp. 62–63.) However, it agreed the instruction implicitly barred the jury from considering the evidence in connection with other mental state issues, including the intent required to find the defendant guilty of dissuading a witness and required to find true the witness-killing special circumstance and concluded this constituted instructional error. (*Id.* at p. 63.)

The high court went on to consider whether the error was harmless, given that the jury found the defendant guilty of premeditated first degree murder, and concluded it was not. (*Townsel, supra*, 63 Cal.4th at p. 64.) The court explained that premeditation and deliberation differed from the specific

46

mental states required for the crime of dissuading a witness and for the witness-killing special circumstance. "Specifically, with respect to the dissuading charge, the jury was instructed, as relevant to mental state, that it had to find defendant had 'the specific intent to prevent or dissuade a witness or victim from giving testimony at a trial proceeding or inquiry authorized by the law.' With respect to the mental state required for the special circumstance, the jury was instructed it had to find 'the witness was intentionally killed for the purpose of preventing her testimony in a criminal proceeding.' These mental states entail knowledge and purpose *beyond an intent to kill . . . .*"[16] (*Ibid.*, italics added.)

That, however, is not the case with respect to the special circumstance of lying in wait. As we have discussed, the *only* requisite mental state for this special circumstance is "intent to kill." (See *Flinner, supra,* 10 Cal.5th at p. 748; *Cage, supra,* 62 Cal.4th at p. 278.) Accordingly, the reason the Supreme Court found the error in *Townsel* was not harmless does not exist

---

[16] CALCRIM No. 725 spells out the requirements of the witness-murder special circumstance as follows:

> "The defendant is charged with the special circumstance of murder of a witness [in violation of Penal Code section 190.2(a)(10)]. [¶] To prove that this special circumstance is true, the People must prove that: [¶] 1. The defendant intended to kill [insert name of decedent]; [¶] 2. [Insert name of decedent] was a witness to a crime; [¶] 3. The killing was not committed during the commission [or attempted commission] of the crime to which [insert name of decedent] was a witness; [¶] AND [¶] 4. The defendant intended that [insert name of decedent] be killed (to prevent (him/her) from testifying in a (criminal/[or] juvenile) proceeding/[or] in retaliation for (his/her) testimony in a (criminal/[or]juvenile) proceeding). [¶] [A killing is committed during the commission [or attempted commission] of a crime if the killing and the crime are part of one continuous transaction. The continuous transaction may occur over a period of time or in more than one location]."

47

here.  And the fact the jury found defendant guilty of attempted murder *and* found true the allegation that he committed the attempted murder willfully and with premeditation and deliberation, demonstrates that any error in not including "intent to kill" and not referencing the special circumstance of lying in wait in the CALCRIM No. 3428 instruction was harmless, as it is not reasonably probable a more favorable result would have been reached had the asserted error not occurred.  (See *People v. Ocegueda, supra,* 247 Cal.App.4th at p. 1407 [whether error in limiting jury's consideration of mental disability evidence was prejudicial is determined under *Watson*[17] standard].)

In finding defendant guilty of attempted murder and finding true the special circumstance that he committed the attempted murder willfully and with premeditation and deliberation, the jury necessarily found that he acted with intent to kill; indeed, found he acted with a heightened intent to kill. Thus, " 'the factual question posed by [an] omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.  In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding [favorable to the defendant] . . . has been rejected by the jury.' " (*People v. Wright* (2006) 40 Cal.4th 81, 98; *People v. Gana* (2015) 236 Cal.App.4th 598, 611 ["By its verdicts and findings the jury clearly 'rejected defendant's [mental state] defense' [citation] in another context and thus the refusal to instruct on unconsciousness was harmless error."].)

---

[17]  *Watson, supra*, 46 Cal.2d 818.

*Sanity Phase Issues*

### Striking Defendant's Testimony

Defendant maintains the trial court erred in striking his testimony for purposes of the sanity phase of the trial and, as a consequence, impinged on his due process right to present a defense. Specifically, defendant asserts the "court's decision was an abuse of discretion because the record shows the prosecution had more than adequate opportunity to cross-examine [him] on issues directly related to the sanity phase."

As discussed above, defendant testified on his own behalf during the guilt phase. However, he refused to answer questions and became hostile and disruptive during cross-examination by the prosecutor, prompting the trial court to have him removed from the court. Thereafter, the court told defendant several times that, having testified on his own behalf, the prosecution was entitled to conduct cross-examination, and if he refused to allow the prosecutor to complete his cross-examination, the court would consider imposing "sanctions." Defendant refused to retake the stand.

Eventually, the court ordered that defendant be brought to court, and again asked if he wanted to complete cross-examination. Defendant again declined.

The court then asked counsel what "sanction[s]" the court should impose, and specifically, whether defendant's testimony should be stricken in whole or in part. Defense counsel argued that "three hours of cross-examination [was] sufficient for the District Attorney to have gotten many points," pointing out the prosecutor had "talked about the criminal priors; [and] he got to go into mental health."

The court responded, "I don't think the prosecution was particularly damaged in the guilt phase of the trial by Mr. Cowell not allowing himself to

49

be cross-examined in relation to the concealment measures that he took, which are shown on the video. However, I think [those measures go] directly to the issues that we will face in the sanity phase which is whether he understood the nature and quality of his acts; or if he did, whether he knew they were legally or morally wrong, and that concealment evidence goes directly to those issues." The court therefore proposed "striking [defendant's] testimony . . . for the . . . sanity phase."

Defense counsel argued this was unwarranted—the prosecutor, having "tactically decided to rattle" defendant on cross-examination and having received the "desired outcome of getting the guy dragged out of the courtroom while he was cursing," "now we're going to strike his testimony?" Counsel could not "imagine this jury having this removed from their consideration in this circumstance."

The prosecution agreed with the court's suggested sanction.

The court took the matter under submission, allowing defendant the opportunity during the sanity phase to complete cross-examination. However, defendant continued to refuse to retake the stand.

Rejecting continued arguments by the defense that striking defendant's testimony was an excessive sanction, the court struck his testimony for purposes of the sanity phase, explaining, "I think that the District Attorney was foreclosed from confronting the defendant with regard to the two crucial issues under the *M'Naghten* Rule as to whether Mr. Cowell understood the nature and quality of his acts or understood the legal and moral quality of those acts. . . . [¶] The reason I thought that the District Attorney was foreclosed from crucial testimony was that from the tape Mr. Cowell took many measures to conceal his identity and apparently acted in a way that

50

showed a total awareness of his surroundings." Yet, the prosecution had not been able to question defendant about what appeared on the tape.

As we have discussed above, "the right to introduce evidence necessarily implicates the responsibility to permit [that evidence] to be fairly tested." (*Fost, supra*, 80 Cal.App.4th at p. 736.) And " 'a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination.' " (*Jenkins v. Anderson, supra,* 447 U.S. at p. 236, fn. 3.)

"Where a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony on direct. As stated in Witkin: 'In either a civil or criminal case, where a party is deprived of the benefits of cross-examination of a witness by *refusal of the witness to answer*, the trial court may *strike out the direct examination.* [Citations.]' (3 Witkin, Cal. Evidence [(3d ed. 1986) Presentation at Trial] § 1877, p. 1831.) . . . Striking a witness's entire testimony is, of course, a 'drastic solution,' only to be employed 'after less severe means are considered.' (*Reynolds, supra*, 152 Cal.App.3d at pp. 47–48.)" (*Fost, supra,* 80 Cal.App.4th at pp. 735–736.)

In deciding whether to strike testimony, the trial court should "consider first whether the witness has refused to submit to cross-examination altogether, rather than refused to answer only one or more questions. In the latter circumstance, . . . the witness's direct testimony need not be stricken in its entirety in every case, and the court should consider both the motive for the refusal to answer and the materiality of the answer. . . . [T]he court [should also] consider solutions short of striking a defendant's entire testimony, such as striking only a portion of the testimony, or instructing the jurors that they may take into account the refusal to answer when assessing

51

the defendant's credibility." (*People v. Brooks* (2017) 3 Cal.5th 1, 30, citing *Reynolds, supra*, 152 Cal.App.3d at pp. 47–48.)

We review the trial court's decision to strike all or part of a defendant's testimony for abuse of discretion. (*Reynolds, supra*, 152 Cal.App.3d at p. 47.)

Here, the court did not strike defendant's testimony for all purposes. Rather, the court allowed the jury to consider defendant's testimony during the guilt phase.[18]

The court also gave careful consideration as to whether the testimony should be stricken for purposes of the sanity phase, and its conclusion that the prosecution had been wholly foreclosed from cross-examining defendant on important evidence, namely the surveillance footage, pertaining to two important issues on sanity, is supported by the record. While defendant continues to insist the prosecutor "was able to ask . . . whether [defendant] understood the nature of his acts, what his plans where [*sic*], what his motivations were, and whether he believed he was morally justified in taking those actions," that does not alter the fact the prosecutor was prevented from asking defendant about significant evidence.

In addition, the court, having observed defendant for weeks during trial, was clearly in a position to find that he was deliberately attempting to subvert the fact-finding process—that "his motivation [was] to get his story out there, but not to subject himself to that type of cross-examination, which would detract from the force of that story."

_____

[18] The court also instructed the jury, "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt." (See CALCRIM No. 361.) Defendant makes no argument on appeal that this instruction was improper.

In sum, defendant has not demonstrated an abuse of discretion by the trial court in striking his testimony for purposes of the sanity phase.

### *Exclusion of Expert Testimony*

Defendant also maintains the trial court prejudicially erred in excluding the proffered testimony of Dr. McKinzey from the sanity phase.

On the eve of the sanity phase, defense counsel informed the court that she wanted to call McKinzey, a psychologist who was no longer licensed, as an expert to opine on defendant's sanity. The prosecution objected, stating defense counsel had given McKinzey copies of defendant's stricken testimony, and this was improper and appeared to be "an effort to back door [defendant's testimony] in or create an opinion that you otherwise would not be able to get."

Defense counsel responded that many months prior, the trial court had appointed Dr. Victoria Campagna pursuant to section 1027 to evaluate defendant for his not guilty by reason of insanity plea. However, when Dr. Campagna got the section 1027 appointment, she "initially . . . thought it was a [section] 1368 appointment." When informed it was for a section 1027 evaluation, she told counsel she was unable to "render an opinion."

At some point, defense counsel gave Dr. Campagna a transcript of defendant's testimony. A week before the sanity phase was to start, Dr. Campagna contacted counsel and stated she was still unable to render an opinion, "in part because of her inexperience." Dr. Campagna also told counsel she had "been paying Dr. McKinzey . . . her court-appointed salary to review all these records" since November. Dr. McKinzey had "created a preces [*sic*], which . . . is a 30-page document . . . so that he could advise his colleague, Campagna, about rendering an opinion." However, Dr. Campagna once again told counsel she could not "render an opinion, but McKinzey, who

is much more experienced and who I've been relying on, I've been paying to do all the records review for me, he can render an opinion."

Counsel called Dr. McKinzey, who told her he thought defendant was legally insane. Counsel then gave Dr. McKinzey certain "jail calls" and told him to "review this stuff" to see if that changed his opinion. Dr. McKinzey called counsel, stated he had "reviewed the jail calls; . . . the videos; I've been reviewing all this stuff for Vicki Campagna, and Vicki Campagna has been paying me to review it, so he's read the 9- to 10,000 pages," and his opinion had not changed. Dr. McKinzey then sent counsel a one-page document, which was an "outline; . . . notes for his testimony." Counsel, in turn, forwarded the outline to the prosecutor, along with Dr. McKinzey's CV and the 30-page precis.

The court inquired if Dr. McKinzey had stated whether defendant "understood the nature and quality of his acts?" Defense counsel replied, "quoting directly now from a portion" of Dr. McKinzey's notes, that " 'considering the totality of the evidence, defendant was insane.' " In that regard, Dr. McKinzey made three points: "One, the patient had a . . . 14-year history of major mental diagnoses; two, the stabbing was senseless and unprovoked, done under the security camera as a result of a delusion; three, he knew the stabbing was legally wrong, (signs of guilty knowledge), but offers a moral defense."

After clarifying that Dr. McKinzey was unlicensed, the court stated that because section 1027 requires the court to appoint "two psychiatrists or licensed psychologists who have a doctoral degree in psychology," it was "concerned . . . there seems to be a substitution for a licensed psychologist with an unlicensed psychologist to render an opinion." Defense counsel responded, "I wouldn't call it a 'substitution.' I mean, this is just us having a

54

defense-retained expert at this point." The court further observed, "nobody was ever told by way of discovery or anything else that after Mr. Cowell refused to see Dr. Campagna, that Dr. Campagna was still, if I can put it this way, retaining her right to offer an opinion even after Mr. Cowell's refusal to see her by farming out the materials that were furnished." It further pointed out "the time limits of all of this. We're to start with the sanity trial at 1:30 this afternoon."

Even more importantly, the court was concerned that Dr. McKinzey was "basing his opinion from what I hear from you on the morality prong of *M'Naghten*. That is in turn based on Mr. Cowell's testimony that he believed his actions were morally justified because he had a right to kill persons who had kidnapped his grandmother. It appears to me that Dr. McKinzey misunderstands California law. . . . It appears to me that Dr. McKinzey's opinion is based on the moral standards that were peculiar to the accused." Defense counsel made no offer of proof to the contrary.

The court ruled defendant could not call Dr. McKinzey.

The sum total of defendant's argument on appeal as to why the trial court purportedly abused its discretion in excluding Dr. McKinzey's testimony is a single paragraph, stating as follows:

> "As an initial matter, if the court believed Dr. McKinzey's opinion was based on an incorrect legal standard, it should have conducted an Evidence Code section 402 hearing to determine conclusively whether it was an admissible opinion. The court relied only on trial counsel's hastily assembled notes of the conversation, and did not review the 30 page precis Dr. McKinzey had prepared. To exclude critical defense evidence on such an [sic] *flimsy* evidentiary record is an abuse of discretion."

To begin with, a trial court is not obligated to hold a foundational hearing sua sponte. (See *People v. Williams* (1997) 16 Cal.4th 153, 196.)

55

Thus, defense counsel having never requested an Evidence Code section 402 hearing, defendant has forfeited any argument on appeal that one was required. (See *People v. Lazarus* (2015) 238 Cal.App.4th 734, 787 [failure to request prong-three *Kelly*[19] hearing or section 402 hearing forfeited issue on appeal].)

Furthermore, a trial court "has broad discretion in deciding whether to admit or exclude expert testimony (*People v. Bui* (2001) 86 Cal.App.4th 1187, 1196), and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion. (*People v. Alcala* (1992) 4 Cal.4th 742, 788–789; see *People v. Lindberg* (2008) 45 Cal.4th 1, 45.)" (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

Here, the trial court identified numerous reasons for excluding Dr. McKinzey's testimony: Defendant's failure to advise the court of Dr. Campagna's reluctance to provide an opinion and 11th-hour request to replace her with Dr. McKinzey. Dr. McKinzey's consideration of defendant's stricken testimony. Dr. McKinzey's lack of qualification under the statute given his licensing status. And his apparent misunderstanding of California law.

The latter point was deemed by the court to be particularly significant, and appropriately so. (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 775–776 (*Sargon*) ["the substantive law . . . is relevant to help define the type of matter on which an expert may reasonably rely"].) A person is legally insane when due to a mental disease or defect, the person was " 'incapable of knowing or understanding the nature and quality of his act or incapable of distinguishing right from wrong at the

---

[19] *People v. Kelly* (1976) 17 Cal.3d 24, abrogated by statute on another ground as stated in *People v. Williamson* (2004) 33 Cal.4th 821, 845–848.

time of the commission of the offense.' " (*People v. Coddington* (2000) 23 Cal.4th 529, 608 (*Coddington*), overruled on other grounds as stated in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  The concept of " 'wrong' " includes both legal and moral wrong; thus, a person " 'who is incapable of distinguishing what is morally right from what is morally wrong is insane, even though he may understand the act is unlawful.' " (*Coddington* at p. 608.) Morality in the context of the insanity defense means generally accepted moral standards, and not distorted standards devised by the accused. (*Id*. at pp. 608–609.)  Thus, a "defendant is sane if he knows his act violates generally accepted standards of moral obligation whatever his own moral evaluation may be." (*People v. Stress* (1988) 205 Cal.App.3d 1259, 1274.)  While a defendant's perspective of the morality of his action(s) "need not reflect the principles of a recognized religion and does not demand belief in a God or other supreme being, it does require a sincerely held belief grounded in generally accepted ethical or moral principles derived from an external source.  '[M]oral obligation in the context of the insanity defense means generally accepted moral standards and not those standards peculiar to the accused.' [Citation.]"[20]  (*Coddington,*  at p. 608.)

---

[20] " ' "For example, if under the influence of his delusion [the defendant] supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence [*sic*], he would be exempt from punishment. If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment." ' (*People v. Rittger* [(1960) 54 Cal.2d 720,] 732; see *Finger v. State* (2001) 117 Nev. 548, 576 [27 P.3d 66] ['Persons suffering from a delusion that someone is shooting at them, so they shot back in self-defense are insane under *M'Naghten*. Persons who are paranoid and believe that the victim is going to get them some time in the future, so they hunt down the victim first, are not'].)" (*People v. Leeds* (2015) 240 Cal.App.4th 822, 829.)

Thus, whether a defendant holds a delusional but sincere belief that his or her actions are morally correct requires both an examination of what the defendant was actually thinking at the time he committed the charged crimes and a determination as to whether his view of the morality of his actions was based on a warped construct of his own making or was grounded in "generally accepted ethical or moral principles derived from an external source." (*Coddington, supra,* 23 Cal.4th at p. 608.) However, it did not appear that McKinzey's proffered opinion took into account the latter determination.

Accordingly, on this record, it cannot be said that the trial court abused its discretion in excluding Dr. McKinzey's testimony.[21]

### *Directed Verdict on Sanity*

Defendant maintains "the sanity verdict must be reversed because the court directed the verdict while the jury was deliberating, denying [him] his constitutional right to due process."

After the jury found defendant guilty as charged,[22] the court proceeded to the sanity phase. Defense counsel advised the court that given the exclusion of Dr. McKinzey's testimony, the defense had no additional evidence. The court observed that defendant could choose to retake the

---

[21] While defendant acknowledges we generally review a trial court's decision on expert testimony for abuse of discretion (see *Sargon, supra,* 55 Cal.4th at p. 773), he asserts Dr. McKinzey's testimony was so probative to his defense that that outweighed any other factor, and its exclusion violated a panoply of constitutional rights, including to present a defense and to due process. However, as we have discussed, Dr. McKinzey's proffered testimony was of no probative value given his apparent misunderstanding of the controlling law.

[22] The jury found the allegation that defendant personally inflicted great bodily injury upon L.W. not true.

58

stand, but if he did not, it would "grant the People's motion for a directed verdict of sanity."

After the court instructed the jury, defense counsel told the court defendant would not be testifying. The prosecutor, in turn, told the court he had not made a motion for a directed verdict.

The court then proceeded with closing arguments, and on their completion on a Thursday afternoon, the jury retired to deliberate. One day later, on a Friday, the jury asked the court two questions: (1) " '[W]ould it make a person insane if they understand an act to be legally wrong but not morally wrong?' " and (2) " '[I]s there a difference between knowing the quality of an act and understanding the quality of an act?' "

The following Monday, the court advised the parties that the Governor had called for home isolation of all Californians over the age of 65[23] and the presiding judge of the court had issued a similar directive. Four members of the jury were over the age of 65.

The court then announced it intended, on its own motion, to direct a verdict of sanity and excuse the jurors on the ground no evidence had been presented that, at the time of the crimes, defendant did not know the nature and quality of his acts or believed that those acts were, under the applicable law, legally or morally justified. Defense counsel did not take issue with the court's assessment of the evidence, but argued that given that the jury had deliberated for over a day and had asked several questions, the court should

---

[23] On March 4, 2020, the Governor declared a state of emergency due to the global COVID-19 outbreak. (*E.P. v. Superior Court* (2020) 59 Cal.App.5th 52, 54.) Two weeks later, the Governor declared a shelter-in-place, asking anyone age 65 and older to stay at home. (<https://www.nytimes.com/2020/03/15/us/coronavirus-newsom-california-seniors-restaurants-bars.html> [as of Nov. 10, 2022].)

"mistry the sanity phase." After further argument by counsel, the court directed a sanity verdict.

"A plea of not guilty by reason of insanity 'is a statutory defense that does not implicate guilt or innocence but, instead, determines "whether the accused shall be *punished* for the *guilt* which has already been established." [Citation.]' (*People v. Hernandez* (2000) 22 Cal.4th 512, 528 (conc. opn. of Brown, J.).)" (*People v. Blakely* (2014) 230 Cal.App.4th 771, 775 (*Blakely*).)

" ' "The test of legal insanity in California is the rule in *M'Naghten's Case* (1843) 10 Clark & Fin.200, 210, as adopted by the electorate in June 1982 with the passage of Proposition 8. That measure added section 25, subdivision (b) . . . , which provides: 'In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense.' Despite the use of the conjunctive 'and' instead of *M'Naghten*'s disjunctive 'or,' this court has interpreted the statute as recognizing two distinct and independent bases on which a verdict of not guilty by reason of insanity might be returned." [Citation.] "The incapacity must be based on a mental disease or defect even though that requirement is not specifically mentioned in [Penal Code section] 25, subd[ivision] (b)." ' ([*People v.*] *Severance* [(2006)] 138 Cal.App.4th 305, 321–322 [(*Severance*)].)" (*Blakely, supra*, 230 Cal.App.4th at p. 774.)

"Because a plea of insanity is an affirmative defense in which the defendant has the burden of proof, the court may, through the grant of a directed verdict, 'remove the issue of sanity from the jury when the defendant

60

has failed to present evidence sufficient to support the special plea.' (*People v. Ceja* (2003) 106 Cal.App.4th 1071, 1089; see *Severance, supra*, 138 Cal.App.4th at p. 324 [noting the court properly directed a verdict of sanity because even if credited and viewed in the light most favorable to the defendant, he failed to proffer sufficient evidence of legal insanity, including evidence providing a substantial basis for the jury to find that when he committed the crimes he believed his actions were morally acceptable].)" (*Blakely, supra*, 230 Cal.App.4th at p. 775.)

A directed verdict on sanity " 'may be granted "only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given." [Citations.] Unless it can be said as a matter of law, that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury. [Citation.] A motion for a directed verdict "is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom. . . . The power of a court in passing upon such motions is strictly limited. It has no power to weigh the evidence, but is bound to view it in the most favorable light in support of the verdict. . . ." [Citation.] In other words, the function of the trial court on a motion for a directed verdict is analogous to and practically the same as that of a

reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict.  Although the trial court may weigh the evidence and judge . . . the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict.' " (*Blakely, supra*, 230 Cal.App.4th at pp. 775–776.)

Thus, while we apply the substantial evidence standard of review, in doing so " 'we do not look for substantial evidence in support of the trial court's ruling that defendant was sane; rather, we look for substantial evidence from which the jury reasonably could have found defendant was *not* sane.  If we find such evidence, then a directed verdict of sanity was improper.' (*Severance, supra*, 138 Cal.App.4th at p. 320.)" (*Blakely, supra*, 230 Cal.App.4th at p. 776.)

Defendant first claims the trial court erred procedurally by directing a verdict after the jury commenced deliberations.  He asserts that "[o]nce an issue of fact such as sanity must be decided" and the jury has retired to deliberate, " 'the jury alone possess[s] the power to pass upon [it].' "  Or stated another way, defendant maintains that a "directed verdict may only be made *prior* to deliberation."

Defendant concedes he has been "unable to find any California authority" supporting this view.  So, he posits that the issue is one of "first impression," characterizing the question as whether, "[o]nce an issue of fact such as sanity must be decided, 'the jury alone possesse[s] the power to pass upon [it].' "

Putting aside for the moment whether there was any substantial evidence raising a triable issue of fact as to sanity, if the record supports a directed verdict, there is no rational reason why it makes any difference whether the court grants such a motion immediately at the close of evidence,

62

after instructing the jury, or after the jury has retired but before it reaches a verdict. A record either does, or does not, contain substantial evidence raising a triable issue for the jury to decide, and if it does not, there is no issue properly before the jury, and we see no reason why a nonsuit cannot properly be granted to bring an end to a legally meaningless exercise. (See *Severance, supra,* 138 Cal.App.4th at p. 314 ["trial courts have the inherent power to remove an insanity defense from the jury when there is no evidence to support it and in such a circumstance 'there is no constitutional infirmity, either under the California Constitution or the United States Constitution, for a judge to remove the issue of sanity from the jury' "], quoting *Ceja, supra,* 106 Cal.App.4th at p. 1089.)[24]

For the first time in his reply brief, defendant asserts section 1140 precludes discharging a jury " 'unless it has rendered a verdict in open court or has declared an inability to agree.' " Since he did not advance this argument in either the trial court or in his opening brief, this issue was neither preserved for appeal nor has it been timely raised on appeal. (See *People v. Tully* (2012) 54 Cal.4th 952, 1075 ["arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party"].) In any case, as defendant acknowledges, no authority supports the proposition that section 1140 limits the time to grant a directed

---

[24] Defendant also asserts the trial court "was reluctant" to direct a verdict on its own motion, which indicated "lingering doubt" as to the propriety of doing so. Not only is this speculation, but the record reflects that from the moment the court was told no further evidence would be presented by the defense during the sanity phase, it was of the view there was no triable issue as to sanity. And even if the court did harbor any "doubt," that is irrelevant to both defendant's procedural challenge to the directed verdict and whether the record does, or does not, contain substantial evidence raising a triable issue as to sanity.

verdict.  Indeed, section 1140 provides that "[e]*xcept as provided by law*, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."  (Italics added.)  The law provides, however, that trial courts have the inherent power to direct a verdict in the absence of any substantial evidence raising a triable issue as to sanity.

Defendant next claims there was substantial evidence raising a triable issue as to sanity and therefore the issue should have been decided by the jury.  As we have discussed, the question in this regard is whether defendant, who had the burden of proof as to insanity, presented sufficient evidence to support a finding that he was incapable of (1) knowing or understanding the nature and quality of his acts or (2) distinguishing right from wrong at the time he stabbed L.W. and N.W.  (See *Blakely, supra*, 230 Cal.App.4th at p. 776; *Severance, supra*, 138 Cal.App.4th at p. 322.)

Having presented no evidence at the sanity phase, defendant points to evidence presented during the guilt phase, specifically (1) the "extensive evidence" of his mental illness; (2) Dr. Coles' opinion that he "was in an active and acute episode of schizophrenia leading up to the offense" (italics omitted), and "that while some of [defendant's behavior] reflected 'goal-oriented' behavior," it could also be "consistent with an acute and active psychotic episode"; and (3) Dr. Gould's opinion that defendant's medical records "were consistent with his manifesting a psychotic illness at the time of the offense" and his statement, in response to a hypothetical question based on defendant's testimony, that defendant's conduct could be "consistent with

64

someone suffering from psychotic symptoms." Defendant also points out the jury deliberated "for days" and asked the court two questions.

There is no question that significant evidence was presented that defendant suffers from serious mental disabilities or diseases. However, as we have discussed, this fact, alone, does not satisfy the *M'Naghten* sanity test. (*People v. Powell* (2018) 5 Cal.5th 921, 955 ["A defendant 'may suffer from a diagnosable mental illness without being legally insane under the *M'Naghten* standard.' "], superseded by statute on another ground as stated in *People v. Eynon* (2021) 68 Cal.App.5th 967, 973.) In addition, defendant was required to establish that his mental condition rendered him incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing between right and wrong in relation to that act. (*Ceja, supra,* 106 Cal.App.4th at p. 1089.)

As we have recited, Dr. Coles testified in the guilt phase of the trial as to defendant's capacity to form the specific intent required for the crimes of premediated and deliberate murder and attempt to commit premeditated and deliberate murder, and for the special circumstance of lying in wait. Dr. Coles was not asked to form an opinion about, nor did he testify as to, defendant's legal sanity. While Dr. Coles testified there was "ample evidence to conclude that he was psychotic up through all of the records which come to right before the crime,"[25] he went on to state, "Since I didn't talk to him, I

---

[25] As we have recited, a little over a week before the stabbings, defendant was placed on a three-day Welfare and Institutions Code section 5150 hold and housed at the John George Psychiatric Pavilion because he reported "had been hearing voices telling him that people were out to kill him." The attending psychiatrist believed his "problems . . . were to be associated with medication noncompliance." Four days before the stabbings, he went to Kaiser Oakland and told the emergency department physician he had suicidal ideations, was hearing auditory hallucinations, was

have no opinion at all as to how that [i.e., what appeared in the medical records] did or did not interact with what he did." He similarly testified, "I think given the record, that it's pretty clear that [defendant] suffers with a psychiatric illness that was untreated and was active at the time of the crime. Now, how it played a role and to what degree, I have no opinion." Thus, Dr. Coles acknowledged he was not asked to provide, nor did he have, an opinion as to whether defendant was legally sane at the time of the crimes.

Dr. Gould similarly testified during the guilt phase as to whether defendant could act with the requisite mental state required to prove the charged crimes.[26] He also was not asked to form, nor did he provide, an opinion as to defendant's legal sanity at the time of the crimes.

At one point, defense counsel asked Dr. Gould if he had considered whether "personality dysfunction" was the sole factor that led to defendant's psychiatric symptoms at the time of the offense.[27] The trial court interrupted, stating counsel's question was not "pertinent to this phase of the trial." Defense counsel asked for some latitude because "[w]e're paying him

---

homeless, and someone had stolen $800 from him and thrown urine on him. He was again referred to John George and released the following day. The day before the stabbings, he returned to the Kaiser emergency department. This time he complained only that he had twisted his ankle a week earlier and it was not feeling better. The physician ordered an X-ray, wrapped defendant's foot, gave him ibuprofen and acetaminophen, and released him.

[26] Gould also never interviewed defendant, and there is no indication he listened to defendant or reviewed defendant's testimony.

[27] CALCRIM No. 3450, on which the jury was eventually instructed, states in part: "Do not base a finding of not guilty by reason of insanity solely on the basis of a personality disorder, adjustment disorder, seizure disorder, or an abnormality of personality or character made apparent only by a series of criminal or antisocial acts."

$250 an hour," and the court acquiesced.  Counsel then re-asked the question, and Dr. Gould replied he had considered it.  He went on to state, "part of evaluating whether someone suffers from one mental illness also includes excluding other causes of their behavior.  And so someone with a personality illness or disorder eventually will behave in dysfunctional ways.  So by diagnosing him with a psychotic **disorder**, it's my opinion that's consistent *with the records that he was manifesting a psychotic **illness**.  Now, he may have an accompanying personality disorder, and that can happen, but it wasn't the sole cause of all the medical records documenting psychotic symptoms."  (Italics and boldface added.)  It is the italicized portion on which defendant relies in his brief.  However, as the entirety of the excerpt, including the bolded we have added, makes clear, Dr. Gould's testimony was that defendant suffered from a mental illness.  The excerpt says nothing about whether defendant was legally insane, i.e., that his illness rendered him incapable of knowing or understanding the nature and quality of his acts, or incapable of distinguishing between right from wrong at the time of the criminal acts.

Prior to both Dr. Cole's and Dr. Gould's testimony, the prosecutor expressed concern about defense counsel asking hypothetical questions based on defendant's testimony, given defendant's refusal to testify on cross-examination.  The prosecutor stated, "I did want to put on the record a concern I have in that my expectation that [defense counsel] is going to ask Dr. Coles hypothetical questions based on her completed direct examination of Mr. Cowell. [¶] . . . [¶] The standard cross-examination or direct examination of experts of this type include hypothetical questions based on direct testimony and the cross-examination of the defendant. [¶] . . . [B]ut my position is that will extremely—that will severely limit my ability to cross the

67

doctor since I was not able to question Mr. Cowell on what he was thinking at the time; what his motivations are, or anything of that effect." While the court had ordered defendant removed from the courtroom for his obstructive behavior, it had not yet told defendant he could not, with impunity, refuse to testify on cross-examination and, likewise, had not yet imposed any consequences for his refusal to testify.

Defense counsel subsequently asked Dr. Gould, during the guilt phase, to assume the following: A person with a "diagnosed psychotic disorder reports that aliens on a BART train kidnapped his grandmother; that one of the aliens stood over him and did not have a permit to do so; he talks about a radio in his head, and the fact that alien females on the train were threatening to assault his grandmother. He goes on to explain that during the BART train ride that aliens were pointing to other passengers while staring at him; assume further that there is surveillance footage on this entire BART train ride that shows no interaction between the diagnosed and anybody else on the train." Counsel then asked Dr. Gould, "Could that report be consistent with somebody suffering from psychotic symptoms?" Gould answered, "Yes." Counsel further asked, "And could that report be consistent with somebody who's experiencing delusions?" Gould answered, "Yes." Counsel additionally asked, "And could those psychotic symptoms occur from somebody who is suffering from schizophrenia?" Gould again answered, "Yes." Thus, like Dr. Coles, Dr. Gould testified only that defendant could have been suffering the symptoms of a mental illness. He did not testify whether such illness rendered defendant incapable of knowing or understanding the nature and quality of his criminal acts, or incapable of distinguishing between right from wrong in relation to those acts.

68

Moreover, prior to the sanity phase the trial court struck defendant's testimony and expressly instructed the jury, "that in a conference out of the presence of the jury . . . I struck Mr. Cowell's testimony at the guilt phase and therefore you are not to consider that testimony in your resolution of this case."   It further instructed, "If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose."   Thus, these instructions effectively excised from the hypothetical question counsel had asked Dr. Gould in the guilt phase nearly all of its underpinnings since they had been based on defendant's testimony.  This, in turn, left Gould's answer untethered to the evidence and therefore of no evidentiary value.  (See *People v. Vang* (2011) 52 Cal.4th 1038, 1046 ["A hypothetical question *not* based on the evidence is irrelevant and of no help to the jury (italics added)."].)

In sum, there was no expert testimony presented as to whether, at the time he committed the crimes, defendant's mental illnesses rendered him incapable of knowing or understanding the nature and quality of his criminal acts, or incapable of distinguishing between right from wrong in relation to those acts.  Nor was there any testimony by defendant.  Thus, the record in this case was no different than the record in *Blakely*—no expert testimony as to sanity and no testimony by the defendant—where the Court of Appeal affirmed the grant of a directed verdict.  (*Blakely, supra,* 230 Cal.App.4th at pp. 776–781.)

This left the testimony of eyewitnesses to the crimes and those having contact with defendant immediately and shortly thereafter, and surveillance evidence.  This evidence established that on the day of the crimes, defendant, who was wearing a hoodie and sunglasses, saw N.W., L.W., and T.W. at the Concord BART station.  He followed the young women onto a train headed

toward Oakland.  While on the train, he retrieved a knife from his backpack and secreted the knife in his pants pockets.  After arriving at the MacArthur station, he exited the train and followed the women onto the platform.  There he waited.  After the next train arrived, but before the young women could board, defendant stabbed L.W. and N.W.

Defendant thereafter fled the scene, mixing in with the crowd, and "directing [the police] back towards the BART station."  He got rid of the murder weapon and the clothing he was wearing at two different spots.  He then ran away from the scene, ending up at the intersection of San Pablo and Stanford, which is "about a 25- to 30-minute walk" from the MacArthur station, where he boarded a bus.  The bus driver testified that when he boarded, defendant asked for a ride, stating his ankle hurt.  Thus, defendant was apparently aware that drivers are allowed to give a "courtesy ride" in their discretion when people are injured or "have no money."  He asked the driver "to take him to the next BART station and he said 12th, 19th," which was the direction the bus was headed.  When the bus arrived in downtown Oakland, the driver informed defendant of their arrival.  After defendant confirmed they were at a BART station, he thanked the driver and exited the bus.

He was arrested less than 24 hours later by BART Police Officer Rodney Barrera.  Barrera testified defendant's answers to questions were "appropriate," he did not "seem like he was having trouble understanding," and he was not exhibiting any behavior "that caused [Barrera] to have concern about his mental well-being."  Defendant gave Barrera his name and told him he was on his way home to Concord.  Later that night, Detective Medeiros interviewed defendant, who appeared "coherent."  Medeiros, who "over the course" of his career had "to contact numerous people, who at least,

70

based on [his] training and experience" appeared to "be suffering from some sort of mental health issue" did not have "any concerns about [defendant's] mental health" during their conversation. In the portion of the interview played for the jury, defendant stated he was on BART headed home to Concord, and that he lived with his aunt.

In sum, while there was substantial evidence defendant suffers from a serious mental illness, there was no substantial evidence that at the time of the crimes defendant was incapable of (1) knowing or understanding the nature and quality of his acts or (2) distinguishing right from wrong. (See *Blakely, supra*, 230 Cal.App.4th at p. 776; *Severance, supra*, 138 Cal.App.4th at p. 322.) Accordingly, the trial court did not err in granting a directed verdict on sanity.[28]

### Prosecutorial Misconduct

Defendant also maintains the prosecutor engaged in misconduct during both the guilt and sanity phases, violating his right to due process and rendering the proceedings fundamentally unfair. He contends the "misconduct fell into three basic categories: (1) improperly implying appellant's actions were racially motivated and injecting inferences of racial animus; (2) goading appellant into erupting before the jury with improper questions and argumentative behavior; [and] (3) asking the jury to draw conclusions not supported by the evidence, vouching and taking advantage of evidentiary rulings."

" ' "A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a

_____

[28] We therefore need not, and do not, address defendant's additional claim that, despite the Covid directives, there was "insufficient evidence" that the jury could not "safely" deliberate, and that the trial court should have declared a sanity mistrial.

71

denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." ' [Citations.] During opening and closing arguments, the prosecution is given wide latitude to make ' "fair comment on the evidence, including reasonable inferences or deductions to be drawn from it." ' [Citation.] ' "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion— and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*Parker, supra*, 13 Cal.5th at p. 72.) " ' "A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." ' " (*Id.* at pp. 71–72.)

### *Racial Motivation*

During the prosecutor's cross-examination of defendant, an argument arose between the prosecutor and defense counsel over a transcript, which was presented to the jury, of a video of the bus ride defendant took on the night of the crimes. The prosecutor asked defendant whether it was, "true while you were on the bus, you essentially tried to pick a fight with the African-American woman on the bus?" Defendant responded that he did not remember. The prosecutor followed up by asking, "Isn't it true you turned to her and said, 'you are trying to throw something on me, little nigger'?" Defendant responded, "No." Defense counsel objected, stating "That is an inaccurate statement; that's not in evidence; that's not on the transcript; that's nowhere in here. That's being fabricated by [the prosecutor]." When the prosecutor pointed to the transcript, defense counsel asserted her copy did not contain any such statement.

The discussion moved into chambers. There, defense counsel again asserted "[t]he transcript that [the prosecutor] gave me was given to me over email and it does not include the N word. He passed out a transcript to [the] jury that includes the N word and that was never given to me." The prosecutor claimed he had handed defense counsel a copy of the transcript he was using when she walked into court. Defense counsel denied that she had been given a copy and asserted the emailed copy "did not mirror what he handed out to the jury. I would have never agreed to have the N word on that transcript because that's not what's heard in the video. You cannot hear that in the video. And he handed out to this jury, and he intentionally did it knowing that my copy said 'unintelligible,' and he put the N word on his copy and it's misconduct and it's flagrant misconduct and I want a mistrial. There is absolutely—that is the most despicable behavior I have ever seen in my entire life trying cases."

The prosecutor responded, "What actually happened is . . . at some point prior to Thursday, I received a transcript . . . I did email it to [defense counsel]. I'm not denying that. In the interim, I reviewed the transcript, which is my practice. I listened to the audio, and it's very clear to me—it's very clear to me what is said. . . . I corrected the transcripts, and there are other corrections as well, and [defense counsel] can go through the transcript and look at that as well. [¶] Thursday, I gave her a hard copy on her desk. There was no doubt in my mind about that. I know that to be the case. In addition, at the end of the day Thursday, there was a discussion in my office by DAs who were in here who said, has [defense counsel] said anything about it. And I said no, she's had it. She's had it since this morning. [¶] The court has a copy that's clearly marked. The exhibit is marked. So to try to claim that I purposely tried to mislead her is absolutely not true. If [defense

counsel] is saying she didn't look at the hard copy I gave her, that's on her. She had it Thursday, Friday, Saturday, Sunday, Monday, and never raised an objection."

The court stated, "[I]f you are going to include that word on a transcript, which you give to the jury, [and] you have not furnished that same transcript to [defense counsel], that is reprehensible conduct to give it to the jury." The court did not decide whether or not the prosecutor, in fact, had given defense counsel the corrected transcript; rather, it stated the prosecutor "should have" brought to defense counsel's attention "that there was a difference in that transcript and the transcript that you had earlier furnished her." The court also denied the motion for mistrial, pointing out it had instructed the jury that "transcripts are not evidence" and stating it would also admonish the jury "to disregard the District Attorney's question as to the content of that transcript."[29]

On appeal, defendant continues to maintain the prosecutor deliberately—and improperly—showed the "corrected" transcript to the jury without affording defense counsel an opportunity to review it in order to portray defendant as a racist and imply he was motivated by racial animus.

To begin with, the trial court refused to make any finding that the prosecutor deliberately tried to get the "corrected" transcript in front of the

---

[29] The court duly admonished the jury as follows: "A transcript was furnished to you yesterday, Exhibit 7C, of audio from the AC Transit bus. That transcript contained a remark allegedly made by the defendant, which was of a racial nature. Whether that remark was made is only an interpretation by the person who was preparing the transcript and is not evidence. Since it is not evidence, you are to disregard it and it is to play no part in your decision making in this case. [¶] As I've also instructed you, questions of counsel are not evidence, so you are also to disregard any questions by the District Attorney that assumed it was true."

jury before defense counsel had an opportunity to see it. Instead, it chastised the prosecutor for failing to alert defense counsel that such a significant "correction" had been made. We wholeheartedly agree with the trial court that the prosecutor's failure to alert defense counsel to this "correction" of the transcript was highly inappropriate and unprofessional. However, we are in no position to make the credibility determination the trial court refused to make, and we agree that given all of the circumstances the trial court's chastisement was an appropriate way to handle the situation.

Even assuming the prosecutor engaged in outright misconduct, we cannot say it is probable that a result more favorable to the defendant would have been reached without the misconduct. The "N" word in the transcript and referenced by the prosecutor was certainly loaded, but it was a single word and a single question in a guilt-phase trial that lasted more than 10 weeks. In addition, the court promptly admonished the jury that the transcript and the prosecutor's question were not evidence and it was to disregard both. In addition, as we have recited, the evidence that defendant committed the stabbings was overwhelming.

### *Improper Questioning*

Defendant maintains the prosecutor's "continu[ous] goad[ing]" of defendant, despite his awareness of defendant's "severe mental illness," "went beyond spirited advocacy to a manipulative and improper attempt to influence the jury." He points to two such instances.

The first occurred when the prosecutor asked about the knife in defendant's hand as seen on the BART surveillance video. The prosecutor asked "Do you remember last Tuesday, me showing you a knife?" and "And you remembered that knife, right?" Defendant replied, "Yes" to both questions. The prosecutor then held up the knife, marked as exhibit No. 3A1,

75

and asked, "That's the knife, correct?"  Defendant responded, "Yes."  To which the prosecutor replied, "It's not a banana, right?"  At that point, defense counsel objected as "argumentative," and the trial court sustained the objection.

The second occurred when the prosecutor asked defendant whether he was "not taking meds because you want to appear crazy, right?"  Defendant responded, "I don't remember that."  The prosecutor asked again later, during his cross-examination, "And again, sir, you're not on any medication today, are you?"  Defendant responded, "I don't take medication at all."  The prosecutor responded, "Because you want to appear crazy, right?"

To begin with, defense counsel made no objection to the latter, medication questions, thus forfeiting the issue on appeal.  (*People v. Foster* (2003) 111 Cal.App.4th 379, 383 [A " 'defense counsel's failure to object to the prosecutor's [questions] waives the issue on appeal.' "].)

In any case, the cross-examination about which defendant complains did not cross the line into prejudicial misconduct.  "[T]he permissible scope of a prosecutor's cross-examination of a defendant is ' "very wide." ' "  (*People v. Mayfield* (1997) 14 Cal.4th 668, 755, overruled in part on another ground as stated in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.)  We have reviewed the prosecutor's entire cross-examination, and though at times vigorous and adversarial, his questions neither individually nor in combination rose to the level of having so "infect[ed] the trial with such unfairness as to render the subsequent conviction a denial of due process, or involve[d] deceptive or reprehensible methods employed to persuade the trier of fact."  (*Parker, supra*, 13 Cal.5th at p. 72.)

### *Vouching and Matters Outside the Record*

Defendant also complains the prosecutor engaged in improper vouching and referred to matters outside the record.

During closing, the prosecutor stated, "The defendant testified on direct examination and said the word 'aliens' six times. There's a little asterisk at the end, because I had the benefit of reading through it all." Defense counsel objected, "as vouching." The trial court sustained the objection. It had also instructed the jury that it could not consider testimony as to which the court sustained an objection and that nothing counsel argued or said was evidence.

A little later, the prosecutor stated, "By the way, cross-examination was 100 pages, and one time he used the word 'aliens.' " The court overruled defense counsel's objection that referring "to all these page counts as vouching and outside of evidence." The court did not err in doing so, as this statement was comment on the state of the evidence, not improper vouching. (See *People v. Weaver* (2012) 53 Cal.4th 1056, 1077 [prosecutor may comment on state of the evidence]; *People v. Jasso* (2012) 211 Cal.App.4th 1354, 1370–1371 [same].)

The prosecutor also discussed, during closing, defendant's jailhouse calls. He stated, "The jail calls. Again, he uses a different PIN . . . . He does that because they are harder to track. We can't find his PIN . . . ." Defense counsel made no objection, so any complaint about this statement is forfeited on appeal. (*People v. Foster*, *supra*, 111 Cal.App.4th at p. 383 [A " 'defense counsel's failure to object to the prosecutor's [questions] waives the issue on appeal.' "].)

In rebuttal argument, the prosecutor stated, "What I know is that mental health records are very, very difficult to get. There's this thing about privilege, right." Defense counsel responded, "Objection, evidence," and the

trial court again sustained the objection. As noted above, the court had also instructed the jury that it could not consider testimony as to which the court sustained an objection and that nothing counsel argued or said was evidence.

Later in rebuttal, the prosecutor stated, "And [defense counsel] is right, they didn't have to present a case, but once they do, it goes into the lump of evidence for your consideration. . . . [W]ell, the prosecution has the burden of proof so maybe we're not supposed to use that evidence. No." The trial court sustained defense counsel's "burden shifting" objection. Again, the court had also instructed the jury that it could not consider testimony as to which the court sustained an objection and that nothing counsel argued or said was evidence.

The prosecutor also stated in rebuttal, "And I told you the only difference between lying in wait for a first degree murder, which this clearly is, and the special circumstance enhancement, is you have to find he intended to kill, and nobody watching that video can have a doubt about that. Nobody should. [¶] If [N.W.] was alive—." Defense counsel objected as "appealing to passions," and the trial court sustained the objection. The prosecutor went on, "If you watch the video, and she hadn't died, you would think he tried to kill those two girls. That's my point. That's what I'm saying. If you saw it, and she hadn't died, you would think he tried to kill her." This time the court overruled defense counsel's objection. The court correctly did so, as this was again fair comment on the evidence.

During the prosecutor's closing argument in the sanity phase, he stated "a court will appoint two doctors when there's a sanity issue. And the doctors come and say, look, he suffered from a mental disease or defect, prong one. And at the time that he was insane, prong two. There's no evidence of that. [¶] . . . [¶] And yes, all of you are intelligent. You figure out the defendant

78

doesn't want to interview with them. . . . He knows they are going to test him for malingering. So there's no evidence of the second prong." Later, after the court sent the jury to deliberate, defense counsel stated, "I didn't object at the time for tactical reasons, but I did want to lodge an objection on the record" that the prosecutor committed misconduct when he "started to talk about how the defense has no experts; and they didn't call any experts when they know very well that I had an expert and I had an expert who was going to come in here and testify that my client was legally insane at the time of the offense, but it got excluded." Counsel then requested admonition, which the court declined. The court did not err in refusing to further admonish the jury. This was a fair comment on the state of the evidence, and the court had, as we have recited, instructed the jury that argument of counsel is not evidence.

In sum, neither individually, nor collectively, did these complained-of statements rise to the level of having so "infect[ed] the trial with such unfairness as to render the subsequent conviction a denial of due process, or involve[d] deceptive or reprehensible methods employed to persuade the trier of fact." (*Parker, supra*, 13 Cal.5th at p. 72.) On the contrary, some of defense counsel's objections were sustained, and the jury was instructed both that questions and comments by counsel were not evidence and it could not consider any testimony to which an objection was sustained. As to several of the complained-of statements, defendant made no objection and thus forfeited any claim of error. And as those objections that were not sustained, the complained-of statements did not constitute misconduct. Furthermore, considered in context and in light of the instructions given, and given the overwhelming evidence supporting the verdicts of guilty, it is not reasonably

79

probable that a result more favorable to the defendant would have been reached without the asserted misconduct.

***Mistrial***

Defendant also contends the trial court erred in denying his motions for a mistrial. He asserts there were "numerous incidents and factors that together rendered the possibility of a fair trial highly unlikely," pointing to three assertedly "dramatic incidents."

The first incident was L.W. vomiting in front of the jury when she was "asked . . . to stand close to the video monitor and narrate . . . the video" footage just before it showed defendant "stabbing her sister in the neck." Defense counsel moved for a mistrial stating, "I think that based upon what just occurred which was—it appeared to me that when [the prosecutor] was started to lead the witness . . . , I objected and it was sustained. And he appeared to then, in my mind, act emotionally; take the witness and stand her within 1 foot of a gigantic TV screen where she was then forced . . . to watch video surveillance, which shows her sister being stabbed to death in front of her. And then she ended up throwing up in front of the jury. And I just don't see—I believe that my client's chance to get a fair trial is irreparably damaged. And on those grounds, I'm moving for a mistrial."

The court denied the motion, stating "I don't believe the fact that the witness throwing up could have been foreseen by the District Attorney and therefore the motion for mistrial is denied."

The second incident was the argument over the AC Transit bus transcript, which we have detailed above (see pp. 75–79, *ante*).

The third incident occurred outside court, on one of the days of the prosecution's rebuttal argument. Defense counsel told the court:

> "I was walking into the courthouse . . . using the main entrance . . . , which is the entrance that I believe would be used by the majority of

our jurors . . . there were a number of protestors. . . . They are standing actually not on public space, but they are standing on the wall that is the courthouse building. And jurors would have to walk up past them. [¶] And in addition to this, there's people screaming on the court steps—excuse me—kitty-corner screaming '[N.W., N.W.]' And when I walked back, the woman in the photo who has a jean jacket on and is holding a heart sign that says '[N.W.]' said 'oh, look who it F-ing is? F you, you F-ing Bitch,' and she wasn't saying 'F-ing,' and she was saying it very aggressively. And she took her signage and shoved it in my face from her position of advantage up above me. And I had to stop in my steps, and I had to fling my head back so as not to be hit by her signage. There was a lot of people around when that happened. I didn't have an opportunity to see if there were any jurors, because I was, frankly, scared out of my mind that I was about to be assaulted, but I think it is highly likely that a juror saw me get assaulted by this woman. And I think it's highly likely, almost undeniable, that the jurors saw this protest that is being allowed to occur not on public space, but being allowed to occur standing on the courthouse. [¶] And with that, I would like to . . . move for a mistrial."

The court denied the motion stating, "I have no indication that this jury's objectivity has been compromised by this incident."

A motion for mistrial "is directed to the sound discretion of the trial court." " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 985–986; see *People v. Lightsey* (2012) 54 Cal.4th 668, 718.) "We review a trial court's ruling on a motion for mistrial for abuse of discretion. [Citation.] Such a motion should only be granted when a defendant's 'chances of receiving a fair trial have been irreparably damaged.' " (*People v. Valdez* (2004) 32 Cal.4th 73, 128.) Even if prosecutorial misconduct is involved, this court will not reverse a conviction absent prejudice to the defendant. (See *People v. Riggs*

81

(2008) 44 Cal.4th 248, 298 [under California misconduct law, no reversal unless "reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted"; and under federal law, no reversal "unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process" ' "].)  Thus, if "any reasonable jury would have reached the same verdict," the trial court's ruling will stand.  (*People v. Bolton* (1979) 23 Cal.3d 208, 214–215.)

The trial court did not abuse its discretion in denying defendant's three mistrial motions.  There is nothing in the record that suggests that the fact one of the victims got sick during her testimony, was "incurably prejudicial." (See *People v. Martin* (1983) 150 Cal.App.3d 148, 162–163 [no mistrial for witness's emotional outburst]; *People v. Roy* (1971) 18 Cal.App.3d 537, 554 [no mistrial for single emotional outburst by murder victim's wife while testifying], disapproved of on another ground as stated in *People v. Ray* (1975) 14 Cal.3d 20, 32.[30])  As for the AC Transit bus video, as we have discussed above, the trial court handled the situation appropriately and it did not call for a mistrial.  As for the out-of-court protest, counsel's assertions that some jurors must have seen it was speculative, and even assuming some jurors did pass by it, nothing in the record indicates it interfered with their service in accordance with the court's instructions.  (See *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1029 [mistrial properly denied where witness comment "added nothing to what the jury knew" and it was speculative as to whether jury even heard comment]; *People v. Panah* (2005) 35 Cal.4th 395, 450–451 [mistrial properly denied in absence of any indication in the record that the jury actually observed an incident of spectator misconduct]; see also

---

[30] Abrogated on another ground in *People v. Lasko* (2000) 23 Cal.4th 101, 110.

*People v. Craig* (1978) 86 Cal.App.3d 905, 919–920 [mistrial properly denied when jury observed picketing outside the courtroom because of court's prompt admonition and even assuming error, it was harmless].)[31]

## DISPOSITION

The judgment is AFFIRMED.

---

[31] Given our rejection of defendant's specific claims of error, we need not and do not address his claim of prejudicial cumulative error.

_____
Banke, J.

WE CONCUR:


_____
Humes, P. J.


_____
Margulies, J.